OPINION OF THE COURT
Harold J. Rothwax, J.
The defendants herein are, and were at the time of indictment, the Minority Leader of the New York State Senate and representative from the 27th Senate District of Manhattan, *911 Manfred Ohrenstein; Senator Ohrenstein’s chief of staff, Francis Sanzillo; Senator Howard Babbush of the 17th Senate District in Brooklyn; Senator Ralph Quattrociocchi of the 55th Senate District in Rochester; and Joseph Montalto, former Senator from the 23rd Senate District in Brooklyn. All defendants are members of the Democratic Party.
The defendants, jointly and separately, have filed omnibus motions challenging the prosecution of this indictment, on numerous grounds. Since, however, the court’s jurisdiction is prerequisite to the resolution of any other issue raised by the defendants, this opinion addresses only the questions of the power of the court to entertain prosecution of the indictment. (CPL 210.20 [1] [h].)[1]
In general, the defendants argue that the subject matter of the conduct charged in the indictment renders the charges nonjusticiable, because continued prosecution would violate the separation powers among the coordinate branches of the State government, delegated by the State Constitution. (NY Const, art III, § 1; art IV, § 1; art VI.)
The indictment alleges that from January 1, 1986 through January 1, 1987 there existed a conspiracy (Penal Law § 105.05) among the defendants "and others known and unknown to the grand jury” to commit the felonies of offering a false instrument for filing in the first degree (Penal Law § 175.35), and grand larceny in the first and second degrees (Penal Law former §§ 155.35, 155.40) by: "Us[ing] legislative employees paid from the treasury of the State of New York to work fulltime on election campaigns on behalf of Democratic candidates for the State Senate. While remaining on the public payroll, these employees were assigned to perform purely partisan duties on behalf of Democratic candidates and performed no legislative duties during the campaigns.”; and by "agreeing] to hire individuals on the State payroll to work fulltime on the election campaigns of Democratic candidates for the State Senate. These employees were hired exclusively to work on the election campaigns of Democratic candidates for the State Senate, and performed no legislative duties * * * [even though] placed on the payrolls of the Minority Leader, other Democratic State Senators, and Legislative Commissions”.
In addition to the conspiracy count, the indictment contains *912 664 substantive counts. The 613 counts of offering a false instrument for filing allege defendants falsely certified to the New York State Senate that certain employees had performed legislative duties entitling them to receive biweekly salaries, when in fact no such duties had been performed during the period specified. The 44 counts of grand larceny allege that the salaries thus paid to these employees were stolen. Six counts of theft of services (Penal Law § 165.15 [9]) allege that the labor of certain of the legislative employees was diverted to the use of political candidates. A single count of defrauding the government (Penal Law § 195.20; L 1986, ch 833, eff Nov. 1, 1986) alleges that from November 1, 1986 to December 24, 1986, defendants obtained property from the State government by engaging in a scheme to defraud involving false and fraudulent pretenses, representations and promises.
Payroll guidelines require a Senator, at the beginning of each legislative session, to sign a recommendation for employment form for each member of the Senator’s staff, giving the employee’s name and title. The title and amount to be paid as salary are determined by the Senator (and, of course, by the Senator’s over-all budget allocation for staff). When the recommendation for employment form, duly executed by the elected official, is received by the Senate personnel office, the person named is put on the Senate payroll. The form is used both for Senator’s staff and commission staff.
In addition to the annual recommendation for employment, a Senator is required to sign and submit to the Senate, biweekly, a payroll certification form. This document is the subject of the false instrument counts in the indictment. The certification is a roster of employees on the Senator’s or commission payroll, giving each employee’s name, title, biweekly salary, and status as annual or session staff. The certification states that those named "are employed by the New York State Senate in the position specified and have actually performed the proper duties of the position for the period specified”,[2] and authorizes the issuance of paychecks.
*913 Under Senator Ohrenstein’s direction the Minority Leader’s office became the center for coordinating Democratic strategy to affect legislation in the Senate, which has been dominated by the Republican Party for more than a decade. The Minority Leader’s staff assumed a dual role. While some research and draft bills, and provide constituent services for Senator Ohrenstein, most serve as staff of the Senate Minority Conference. The purpose of the Conference is to forge a cohesive legislative agenda among Senate Democrats as a whole. To this end, the Conference staff assist Democratic Senators to develop and draft legislation, write newsletters and comprehend pending bills. Some Minority Leader staff are assigned on a permanent basis to other Democratic Senators, while remaining on the Leader’s payroll. The Conference staff also assist newly elected Senate Democrats to establish district offices, develop legislative agenda and understand the legislative process.
In order to perform these functions, the Minority Leader’s staff consists of four groups: the district office; the program staff; commission staff; and the local government coordinating staff. The Minority Leader’s office also includes a counsel staff, a press and public relations staff, and administrative and clerical staff.
The minority counsel’s office also supervises the Minority Commission staffs, even though they are technically employed by the legislative commissions. The evidence revealed that commissions were often inactive, commission staff underutilized, or minority staffers given no active role. Some Minority Commission staff were used as Minority Conference staff and assigned work unrelated to commission duties. The number of Minority Commission staff was not established.
Local government coordinators are annual employees. The upstate coordinators, during the legislative session, are primarily assigned to Albany to assess the political impact of proposed legislation. Downstate coordinators (and a few upstate) are assigned one or more Senate districts, often where they have political experience and affiliations. Generally, the assigned districts are represented by a Republican Senator or by a Democratic incumbent whose electoral margin is tentative. These coordinators act as liaison between the Minority Conference and the district’s political, elected and business *914 leaders; follow the legislative record of the incumbent to assess its political impact within the district; and analyze issues that are neglected by the incumbent or that could be helpful to a Democratic insurgent. The coordinator also prepares a "profile book” on the district, which contains a description of the demographics of the district; the names of political, elected and business leaders; voting patterns and poll results; the incumbent’s legislative history; and recurrent political issues. The purpose of the book is twofold: to help the Conference develop a politically beneficial legislative program, and to assist political campaign strategists. In campaign years the books are used in the conduct of Democratic Senate campaigns.
Minority Conference operations, political and legislative, are supervised by a group of Democratic Senators, including the Minority Leader, designated the Steering Committees.
The Political Steering Committee supervises Democratic campaigns for the State Senate. The Committee selects candidates and target districts based upon the relative probability of victory by an insurgent Democrat or defeat to an incumbent Democrat. Districts are selected in part upon information provided by pollsters on the Minority Leader’s payroll. When the districts are selected, the Committee sets the campaign budget, approves the campaign manager and supervises formulation of campaign strategy. Once the campaign begins, the Committee receives regular reports on the status of the campaign; reviews the efforts of campaign managers; reviews poll results; modifies campaign budgets; and assigns members to visit and report to the Committee on the progress of campaigns.
The authority of the Minority Conference Steering Committee over Democratic Senate campaigns is established by the Committee’s control over two sources of material assistance to selected candidates: funds of the Senate Democratic Campaign Committee (SDCC), and the assignment of Senate minority staff to work in campaigns.
Senator Ohrenstein told the District Attorney that he and other Minority Conference Senators decided in 1986 to use all resources at their disposal to elect a Democratic Senate on the coattails of Governor Cuomo, who was running for reelection and was known to be very popular. The Committee targeted a number of Senate districts for commitment of SDCC funds, including Montalto’s former district in Brooklyn and Ber *915 man’s in Nassau County; a second district in Nassau; and districts in Cortland and Westchester Counties. The incumbencies of Senators Quatfrociocchi in Rochester and Oppenheimer in Westchester were thought to be in danger.
Of the 39 minority staff whose employment is at issue in the indictment, 36 worked in the 1986 Senate campaigns.
These 36 employees fall into three categories:
1. Senate staff employed prior to 1986, used in the 1986 campaigns (10).
2. Staff employed during the 1986 campaigns and retained during the 1987 session (8).
3. Staff employed only during the campaign (18).
Those who had been on staff before January 1986 (category 1) remained on staff after January 1987.
Many of those hired during the campaign continued on staff into the 1987 session (category 2). Four of these new employees were hired directly onto Senator Ohrenstein’s staff. All four of these staff members currently review' legislation in some form. The other four new staffers were assigned to commissions during the campaign. Two of these were transferred to Senator Ohrenstein’s staff in January 1987 as local government coordinators. Neither performed any commission or other legislative work during the campaign. The remaining two transferred to other staffs in January. There was evidence that both of these staffers performed commission work during the campaign period.
Most of those named in the indictment who were hired onto the Senate payroll during the 1986 campaign were not retained (category 3). In the majority of these employments, there is no evidence of any legislative work during the campaign period. There are two exceptions. There is also a fourth category of person whose salary is at issue in the indictment, but whose purported employment does not fall within the scope of the alleged conspiracy surrounding the 1986 campaigns. These are known, colloquially, as "no shows”.
Senator Ohrenstein and Sanzillo are charged with hiring onto the Senator’s payroll two political appointees who did virtually no work.
On April 9, 1987 the State Legislature passed a bicameral resolution on the use of legislative staff in political campaigns. The resolution established a commission to review "legislative practice in relation to political campaign activities of legisla *916 tive employees” and to report to the Legislature any actions for the adoption of permanent guidelines regulating political campaign activity. The resolution contains four findings: that it is "the exclusive prerogative of the Legislature as a coordinate branch of government to provide guideline(s) * * * with respect to participation of legislative employees in political campaign activity”; that "there exist no guidelines * * * regarding the participation of such employees in political campaign activity”; that the purpose of the resolution is to establish interim guidelines; that "the needs of legislators and the Legislature vary from time to time, and it is recognized that legislative staff may therefore be'required to work irregular hours and periods of time. Considering the fact that legislative employees frequently perform their official duties for longer hours during certain periods of time, the time that a legislative employee is not required to perform such official duties frequently occurs when the Legislature is not in active session and may occur at other periods of time; and * * * legislative employees are not prohibited by statute, rule, regulation or otherwise from engaging in political. campaign activity.”
THE LAW
Essentially, the People’s theory of prosecution is that political campaign activities are not legislative duties, and thus to certify that enrollees on the Senate payroll engaged full time in campaigns (categories 1-3) are performing "the proper duties of the position” of Senate legislative staff is to make a false statement (Penal Law § 175.35); that inducing the State to pay legislative salaries based upon such false pretenses constitutes larceny (Penal Law § 155.05 [2]); and that diverting Senate employees to work full time in campaigns while continuing on the legislative payroll (category 1) is theft of the employees’ services to the State (Penal Law § 165.15 [9]). With respect to those employees who allegedly performed no work (category 4) the People’s theory is simply that the certification that they worked is false and that to pay State salaries without requiring services is larceny.
The defendants’[3] central argument against judicial consideration of the prosecution is that any resolution of the issues presented requires a determinatión of the proper nature and *917 scope of legislative staff duties, which defendants assert is the exclusive prerogative of the Legislature shielded from executive complaint or judicial review by the constitutional principle of the separation of powers.
The separation of powers principle has been described as follows: "Our State government, like the Federal Government, is a tripartite institution, with powers variously distributed between three coequal branches (see NY Const, art III, § 1; art IV, § 1; art VI). It comprises a system of checks and balances intended to ensure 'the preservation of liberty itself, which is ended by the union of the three functions in one man, or in one body of men. It is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its peculiar duties, by either of the others’ (People ex rel. Burby v Howland, 155 NY 270, 282; see, also, People ex rel. Broderick v Morton, 156 NY 136). The power of the judiciary is as subject to such limitations as is that of its co-ordinate branches of government, for the spectre of judicial tyranny is no more palatable to a free people than is the threat of an uncontrolled executive or legislative branch.” (Saxton v Carey, 44 NY2d 545, 549 [1978]; see also, Rapp v Carey, 44 NY2d 157, 162-163 [1978].)
Defendants rely specifically on two aspects of the separation of powers doctrine: the immunity conferred on legislators by the Speech or Debate Clause of our State Constitution (NY Const, art III, § 11; see, United States v Helstoski, 442 US 477, 491 [1979]), and the nonjusticiability of political questions (Baker v Carr, 369 US 186, 210 [1962]; Matter of New York State Inspection, Sec. & Law Enforcement Employees v Cuomo, 64 NY2d 233, 238 [1984]).
SPEECH OR DEBATE
The Speech or Debate Clause of our State Constitution (NY Const, art III, § 11), like its Federal counterpart,[4] provides: "For any speech or debate in either house of the legislature, the members shall not be questioned in any other place.”
The privilege conferred by the clause is available to members of the Legislature for things done by their legislative staff, as agents of the members, which would be privileged if *918 performed by the legislators in person. (Gravel v United States, 408 US 606, 616-617 [1972].) Legislative aides also derive a privilege from their employers to the extent their acts would be immune if performed by a legislator. (Supra, at 622.) Therefore, defendant members of the Legislature and the defendant Sanzillo may invoke the protection of the clause.
In United States v Brewster (408 US 501 [1972]) the Supreme Court rejected the claim of a former United States Senator that he was immune from prosecution for soliciting and accepting bribes in the performance of his official Senate duties. The court noted that "[t]he sweeping claims of appellee would render [legislators] virtually immune from a wide range of crimes simply because the acts in question were peripherally related to their holding office” (408 US, supra, at 520). The court looked to the history and purpose of the clause which is not intended to confer blanket immunity from criminal prosecution on the class of legislators, but to protect the integrity , of the legislative process. Unlike the English Parliaments whose struggle against executive dominance gave rise to the clause, our Legislatures are coordinate branches of government and our clause "designed to preserve legislative independence, not supremacy” (supra, at 508). Therefore the court concluded that while the executive branch could not maintain a conspiracy prosecution upon evidence of the text of a speech given in Congress, nor the courts inquire into the Congressman’s motivation for the speech (United States v Johnson, 383 US 169 [1966]), it could maintain a bribery prosecution which required nothing more than evidence of a promise to perform a legislative act. (United States v Brewster, 408 US, supra, at 526-527.) The court observed that "[t]aking a bribe is, obviously, no part of the legislative process or function; it is not a legislative act” (supra, at 526). "[A] prosecution that, though founded on a criminal statute of general application, 'does not draw in question the legislative acts of the defendant member * * * or his motives for performing them.’ [United States v Johnson, supra, at 185]” (supra, at 510) is not at odds with the Speech or Debate Clause.
Pursuant to these general principles, the court has refined the definition of legislative acts to protect the integrity of the legislative process without "extending] the privilege beyond its intended scope, its literal language, and its history, to include all things in any way related to the legislative process * * * [W]e have no doubt that there are few activities in which a legislator engages that he would be unable somehow *919 to 'relate’ to the legislative process.” (United States v Brewster, 408 US, supra, at 516.)
In another opinion rendered contemporaneously with Brewster (supra), the court declared:
"Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House * * * [C]ourts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberation.’ United States v. Doe, 455 F.2d [753], at 760 [1st Cir 1972] * * *
"[The Clause], as we have emphasized, does not purport to confer a general exemption upon Members of Congress from liability or process in criminal cases. Quite the contrary is true. While the Speech or Debate Clause recognizes speech, voting, and other legislative acts as exempt from liability that might otherwise attach, it does not privilege either Senator or aide to violate an otherwise valid criminal law in preparing for or implementing legislative acts. ” (Gravel v United States, 408 US, supra, at 625-626 [emphasis added].)
Thus the court held that a Grand Jury could properly inquire as to any arrangement a Senator or his aide may have made to republish the text of the Pentagon Papers and as to the source from which these classified documents were obtained, as long as such inquiry did not include events occurring at the Senate subcommittee hearing where the Papers were introduced into the public record, or other legislative proceedings or processes.
The defendants herein assert that the acts of hiring staff on the legislative payroll, determining staff assignments, and certifying that the staff are performing proper duties, are legislative in character within the foregoing definition.
The court finds that filing a payroll certification with the Senate is an administrative, not a legislative, act. In United States v Bramblett (348 US 503 [1955]), the Supreme Court affirmed a Congressman’s conviction under 18 USC § 1001, for filing payroll authorization forms with the disbursing office of *920 the House of Representatives, falsely certifying that a woman who did no congressional work was entitled to compensation as the Congressman’s official clerk. (See, United States v Diggs, 613 F2d 988, 999, and n 66 [DC Cir 1979], cert denied 446 US 982.) The court, in Brewster (supra), characterized Bramblett’s acts as among those " 'related’ to the legislative office”, without being legislative acts within the meaning of the Speech or Debate Clause. (408 US, supra, at 522, n 16; see, United States v Eilberg, 507 F Supp 267, 287 [ED Pa 1980].) The Federal Court of Appeals for the District of Columbia also allowed the prosecution of a Congressman under 18 USC § 1001 for fraudulently authorizing congressional salaries to be paid to persons who provided services for the Congressman’s funeral home. Although the Congressman did not explicitly assert speech or debate immunity, the court indicated that the acts at issue were not in any event of a legislative nature. (United States v Diggs, 613 F2d, supra, at 1001.)
This court also finds that the speech or debate cases allow a more rigorous inquiry into the purpose of the employment, certification, and assignment of Senate staff than the defendants’ arguments suggest.
The Supreme Court has yet to directly address the extent to which speech or debate considerations affect congressional employment decisions. (Cf., Davis v Passman, 442 US 228, 235, n 11 [1979].) However, two Circuit Courts of Appeals have considered the issue in context of employment discrimination cases.
Legislative employees are not immune from judicial scrutiny simply by virtue of their employment with the Legislature. Rather the court must examine the nature of the employees’ activities to determine whether they are sufficiently related to the legislative process that decisions in regard to their employment require speech or debate protection. In cases where the decision to hire (Agromayor v Colberg, 738 F2d 55 [1st Cir 1984]) or fire[5] (Browning v Clerk, U. S. House of Representatives, 789 F2d 923, 926 [DC Cir 1986]) is at issue, the nature of the employment in general may determine the scope of the required immunity. In cases of alleged discrimination, the courts’ refusal to review legislative employment *921 decisions too closely is based upon a need to preserve a legislator’s discretion in deciding who is most representative of the legislator’s constituency. (Compare, Davis v Passman, 442 US, supra, at 249-250 [dissent of Burger, Ch. J.].) However, where, as in this case, the issue is the particular activity of persons concededly entitled to speech or debate protection under appropriate circumstances, the Supreme Court has examined the act in question to determine whether the immunity applies. Thus in Gravel (supra) the Senator and his aide were entitled to claim immunity for including the Pentagon Papers in the record of a committee proceeding but not for arranging publication of the Papers outside of Congress. To paraphrase Agromayor (supra), the extent to which a legislative employee’s assignment is essential to the legislative process should determine whether the legislator who made the assignment is exempt from examination about the assignment.
Although defendants would have this court characterize it as legislative activity, political acts designed to elicit public support for a legislator or legislative program, while perhaps useful in "preparing for or implementing legislative acts” (Gravel v United States, 408 US, supra, at 626) have been explicitly distinguished, by the Supreme Court, from legislative acts: "It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate 'errands’ performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters’ to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases. But it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech or Debate Clause.” (United States v Brewster, 408 US, supra,, at 512 [emphasis added].)
Similarly, in Hutchinson v Proxmire (443 US 111 [1979]), the court allowed a defamation suit against Senator Proxmire for statements made while giving an "award” for wasteful govern *922 ment spending. In response to the Senator’s assertion of legislative immunity, the court observed that while it is part of the legislative process for Congress, through committee hearings, to gather facts necessary to legislate or to examine the executive’s implementation of legislation, and to express its collective opinion in committee reports, it is no part of the "legislative function or the deliberations that make up the legislative process” to inform the public by press release, newsletter or other media which "represent the views and will of a single Member.” (443 US, supra, at 133.)
The same distinction was drawn by the Attorney-General of New York State more than 60 years ago, in response to a request by the Assembly for "an opinion fully stating the privilege of speech and act accorded to members of the Legislature under the Constitution and Laws of the State”. The Attorney-General, after reciting the text of our State Speech or Debate Clause and reviewing judicial authorities in other jurisdictions, concluded, inter alia, "[t]hat in regard to discussions of a political nature members share the immunity of private persons” in context of suits for libel. (1924 Opns Atty Gen 157, 159.)
The activities of the staff at issue were blatantly political. They were either hired or assigned to conduct political campaigns, fund raise or take opinion polls in support of such campaigns. These functions have no relation to the deliberative and communicative processes by which legislators inform themselves in committee, or to proceedings for the consideration of legislation, or to any other actions taken by the Legislature as a body. (Gravel v United States, 408 US, supra, at 625; Hutchinson v Proxmire, 443 US, supra, at 132-133; United States v Brewster, 408 US, supra, at 512-513.) There can be no serious contention that the decision to employ persons exclusively to perform 'political campaign functions (category 3)[6] or no function (category 4) is a legislative act deserving immunity from prosecution. Moreover, under the facts as developed before the Grand Jury, the court finds that the assignment of legislative staff full time to political campaigns is no more deserving of speech or debate protection.
Although many who were on the Minority Conference staff when the 1986 Senate campaigns began (category l),[7] or who *923 were retained on staff in 1987 after being hired to perform campaign work in 1986 (category 2), performed some legislative task at some point in time either before or after the campaigns, during the time periods at issue almost[8] all of these staffers did nothing other than political campaign work.
Most began as local government coordinators. Although local government coordinators sometimes performed legislative functions, such as acquainting newly elected legislators with the legislative process or advising Conference members about specific pending legislation, during campaigns their function was exclusively political. Others were commission staff who testified they performed no legislative function. Zebersky and Wolff engaged exclusively in fund-raising activities for the Minority Conference campaign chest.
Therefore, with five exceptions noted infra, there was no evidence that any staffer employed as charged in the indictment was engaged in any activity even remotely legislative in purpose.
The exceptions are as follows:
Bob Bergin, a member of the minority counsel’s office, testified he received a report that two staffers, Patrick Prefetti and Ingrid Stettner, who worked in the Morgan campaign on the payroll of the Dairy Commission, in fact produced a report for that commission in October 1986. Neither Prefetti, Stettner nor the person who reported to Bergin testified.
Pauline Toole, a student intern enrolled on the minority payroll assigned to the Oppenheimer campaign, testified that in addition to campaign duties; she prepared informational brochures on State agencies and home-rule legislation for dissemination to constituents.
Tom Cetrino, a local government coordinator assigned to the Quattrochiocchi campaign, testified that MaryRose Stevenson and he worked in September and October 1986 arranging a legislative hearing on windfall profit tax issues. Stevenson did not testify.
There was testimony from several sources that Diane DeVito, who was put on Senator Quattrociocchi’s staff to program a computer at campaign headquarters, also programmed *924 information about constituent inquiries into a computer at Senator Quattrochiocchi’s district office.
The court finds, within the standards previously articulated, that the preparation of informational brochures for constituents (Hutchinson v Proxmire, 443 US, supra, at 132-133; United States v Brewster, 408 US, supra, at 512) and the collection of data on constituent inquiries (United States v Brewster, supra; Hoellen v Annunzio, 468 F2d 522, 527, n 8 [7th Cir 1972]) are not legislative acts. Therefore, inquiry into the activities of Toole and DeVito during the period at issue would not constitute an intrusion into the legislative process.
It is equally certain that the preparation of commission reports by commission staff (Gravel v United States, 408 US, supra, at 624) and arranging commission hearings (Hutchinson v Proxmire, supra, at 132) are legislative acts. Therefore, the question is presented whether inquiry may be made into Stettner’s, Stevenson’s and Prefetti’s campaign activities without intruding upon legislative prerogatives.
Specifically, the issue is whether the People can establish a prima facie case of larceny and of filing false instruments in regard to these employees without adducing evidence of a legislative act or of the motive behind such an act. (United States v Brewster, 408 US, supra, at 510.) To establish these charges requires proof of a knowing misrepresentation that the person named in the. payroll certification was performing the proper duties of the position certified. (Penal Law § 175.35.) In order to determine whether such representation was falsely made, a jury must be able to determine to what extent, if any, the named employees performed the proper duties of their positions as certified by the defendants. As previously noted, if duties of a legislative nature were performed, the assignment of such duties requires protection as a legislative act. (Agromayor v Colberg, supra; Browning v Clerk, U. S. House of Representatives, supra.)
Since noné of these three commission staffers was called to testify, no evidence was developed about the extent to which they engaged in nonlegislative as opposed to legislative activities. However, the testimony of others, if credited, does establish that these staffers did not exclusively perform campaign work while on commission payrolls. It would seem impossible, under the circumstances, to establish that the defendants falsely certified these employees without inquiring into specifics of their legislative assignments, the amount of time *925 spent performing them, and the results. (See, Browning v Clerk, U. S. House of Representatives, supra, at 930.) Moreover, it would seem impossible to establish that the defendants intended to defraud the State by such certifications (Penal Law § 175.35) without inquiring into their motives in assigning legislative duties. (Cf., Hoellen v Annunzio, 468 F2d, supra, at 527.)
Ordinarily, credibility is the exclusive province of the Grand Jury and the court must disregard testimony contrary to the People’s theory of prosecution when evaluating a motion to dismiss an indictment. (See, e.g., People v Richards, 128 AD2d 387, 388 [1st Dept 1987].) But the ordinary rules establishing the People’s burden before the Grand Jury must give way to the values protected by the Speech or Debate Clause. (United States v Helstoski, 442 US, supra, at 488-492.) The clause specifies that a legislator "shall not be questioned in any other Place” about legislative acts and, therefore, the Supreme Court has held "legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation’s results but also from the burden of defending themselves.’ Dombrowski v Eastland [387 US 82] at 85 [1967] * * * [O]nce it is determined that Members are acting within the 'legitimate legislative sphere’ the Speech or Debate Clause is an absolute bar to interference”, including criminal prosecutions. (Eastland v United States Servicemen’s Fund, 421 US 491, 503 [1975].) Within the Grand Jury context, this necessarily means once evidence appears that the activity under investigation is arguably within a proper legislative sphere, the prosecutor as representative of the executive branch must establish that the prosecution will not encompass privileged legislative acts. (Compare, Eastland v United States Servicemen’s Fund, 421 US, supra, at 509-510; McSurely v McClellan, 553 F2d 1277, 1296, nn 66, 68 [DC Cir 1976]; Doe v McMillan, 412 US 306, 312-313 [1973].) Any other rule would ultimately place a burden on the legislator to prove that the prosecution impinged on an area entitled to speech or debate protection. This burden is contrary to the Supreme Court’s construction of the clause, since it could not usually be met without subjecting the legislator to a trial involving potentially protected legislative conduct. (United States v Helstoski, supra, at 488; Eastland v United States Servicemen’s Fund, supra, at 503.)
Here the prosecutor failed to establish that no legislative act is implicated in the charges voted against Senator Ohren *926 stein and Sanzillo with respect to the employment of Stevenson, Stettner and Prefetti. Stevenson’s co-worker testified that both were engaged in arranging a legislative hearing which eventuated from their efforts. There was no contradictory evidence. Nor was any evidence developed that Stevenson spent significant periods performing only campaign or nonlegislative work.
Bergin testified he received information, in the regular course of his duties as supervisor of Minority Commission staff, that Prefetti and Stettner had prepared a Dairy Commission report. Although Bergin named the source of his information, the informant was not called to testify. Thus the evidence that Prefetti and Stettner arguably performed legislative acts during the period at issue was neither clarified nor refuted.
As the court noted in Eastland v United States Servicemen’s Fund:
"[This] approach * * * ignores the absolute nature of the speech or debate protection * * *
" 'Congressmen and their aides are immune from liability for their actions within the "legislative sphere,” Gravel v. United States, supra, at 624-625, even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes.’ ” (421 US, supra, at 509-510.)
Therefore, the larceny and false instrument counts relevant to the employment of these three commission staff are dismissed.
The People contend that the Speech or Debate Clause comprehends all separation of powers concerns relevant to the prosecution of a legislator for crimes allegedly committed in relation to the legislative office. This contention rests upon a footnote in Davis v Passman (442 US 228, supra), where the court observed that if judicial recognition of a cause of action against a legislator for employment discrimination does not intrude into legislative acts, the issue can be decided upon settled principles of constitutional law under the Equal Protection Clause. (442 US, supra, at 235, n 11.) The court noted that such consideration does not involve separation of powers concerns beyond those addressed by the Speech or Debate Clause. However, there are other nonlegislative areas, apart from employment discrimination, in which courts consistently decline to intervene in deference to the legislative branch.
*927 For example, courts defer to the Legislature in the administration of its internal affairs. (Matter of Gottlieb v Duryea, 38 AD2d 634 [3d Dept 1971], affd without opn 30 NY2d 807, cert denied 409 US 1008; see also, United States v Eilberg, 507 F Supp, supra, at 275-276.) The court in Gottlieb v Duryea (supra), noting that "courts should not review * * * internal dispute[s]” within the Legislature, declined to review a decision by the Speaker of the Assembly to deny franking privileges for mail the Speaker deemed " 'too political’ ”. (38 AD2d, at 634-635.) The court so held even though use of the franking privilege is not a legislative act (see, e.g., Hoellen v Annunzio, 468 F2d, supra, at 527, n 8) and is governed by statute (Legislative Law § 16; cf., United States v Eilberg, 507 F Supp, supra, at 284-287). Moreover, the court in Duryea relied upon general separation of powers principles without reference to our State Constitution’s commitment of internal rule-making authority exclusively to the legislative branch. (NY Const, art III, § 9; cf., e.g., Consumers Union v Periodical Correspondent’s Assn., 515 F2d 1341, 1346-1351 [DC Cir 1975].)
Although most of the functions of the local government coordinators, whose activities form the core of the conduct at issue, were not legislative acts protected by the clause, they nonetheless included "political” functions that are legitimate to the office of a State legislator. (United States v Brewster, 408 US, supra, at 512.) Government coordinators often assist in the preparation of constituent newsletters, in writing legislator’s speeches to constituents, and in other representative tasks of political benefit to legislators, which are legitimate activities. (United States v Brewster, supra; People v Blumenthal, 55 AD2d 13, 15 [1st Dept 1976] [legislator’s bringing a State employment training program to his district "was a justifiable activity”]; see also, Berry v Gordon, 237 Ark 547, 376 SW2d 279, 287 [1964] [public relations is a legitimate activity of State legislators].) The maintenance of district offices to provide constituent services and access is also a legitimate activity of State legislators, albeit nonlegislative within the Speech or Debate Clause. (Spearman v Williams, 415 P2d 597, 602 [Okla 1966]; Chamber of Commerce v Leone, 141 NJ Super 114, 357 A2d 311, 329 [1976].) Accordingly, the court will consider whether this prosecution intrudes upon these political activities in a way that violates the "political question” aspect of the separation of powers doctrine, as the defendants allege.
*928 THE POLITICAL QUESTION DOCTRINE
The Supreme Court, in Baker v Carr (369 US 186, 217 [1962], supra), declared "[t]he doctrine of which we treat is one of 'political questions,’ not one of 'political cases’ ” and described several formulations of the doctrine which vary according to the context in which the questions arise:
"Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question’s presence.”
Defendants assert that this prosecution violates the political question doctrine in several formulations, as follows:
1) Since the Constitution commits the power of appropriation to the Legislature, a court cannot review the manner in which legislators spend funds appropriated for staff salaries.
2) The court cannot review the services rendéred by legislative staff, since no judicially discoverable and manageable standards exist for distinguishing "proper duties” from allegedly improper political acts.
3) However desirable standards for the regulation of political campaign activity by legislative staff, there can be no judicial formulation of such standards without an initial policy determination that is essentially legislative and therefore inappropriate.
THE CONSTITUTION
There are two sections of the State Constitution arguably interdicting this prosecution.
NY Constitution, article VII, §7 states: "No money shall ever be paid out of the state treasury or any of its funds * * * *929 except in pursuance of an appropriation by law * * * and every such law making a new appropriation * * * shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied”.
NY Constitution, article XIII, § 14 states: "The legislature may regulate and fix the wages or salaries and the hours of work or labor * * * of persons employed by the state”.
Both of these provisions define legislative powers in the exercise of which the other branches of government generally may not interfere. (Matter of Bartlett v Morgan, 42 AD2d 435, 437 [4th Dept 1973]; People v Tremaine, 252 NY 27, 38-39 [1929].) Thus, the Governor must incorporate the Legislature’s budget, intact as submitted, into the State’s annual budget (NY Const, art VII, § 1), subject only to the Governor’ power of subsequent line item veto. (NY Const, art IV, § 7.) The judiciary’s role in this process is limited to "resolv[ing] disputes concerning the scope of the authority which is granted by the Constitution to the other two branches of the government” (Saxton v Carey, 44 NY2d, supra, at 551).
The annual legislative budget for the period at issue in the indictment included the category "personal service” for the Senate. Itemization within this category included "personal service of employees and for temporary and expert services of legislative and program operations”, and "personal service of employees and for temporary and expert services of standing committees”. The salaries at issue were obtained from payrolls formed under these appropriations without further itemization or specification of the kinds of services to be performed.
The Legislative Law delegates to the Senate Minority Leader the power to "appoint such employees to assist him in the performance of his duties as may be authorized and provided for in the legislative appropriation bill” (Legislative Law § 6 [2]). A similar power is delegated in regard to commissions. (Legislative Law § 9.) The Minority Leader also has the statutory discretion to set the amount of compensation and duration of the employment for the legislative staff he or she appoints. (Legislative Law §§ 8, 11.) The Legislative Law does not define the duties of the Minority Leader or of his or her legislative staff.
The People contend that the court’s intervention here is proper because the State Constitution specifically prohibits the Legislature from appropriating State funds in the manner of the expenditures made by these defendants. (NY Const, art VII, §8.)
*930 Certainly, the question whether such expenditures are permissible within constitutional limits is peculiarly within the court’s province to decide. The fundamental role of the courts in our tripartite government is "to say what the law is” (Marbury v Madison, 1 Cranch [5 US] 137, 177 [1803]; United States v Nixon, 418 US 683, 705 [1974]). An appropriations act is, of course, a law subject to judicial interpretation. (See, People v Tremaine, supra; Thompson v Hofstatter, 265 NY 54, 69 [1934].) It is no less fundamental that the Legislature must comply with the provisions of the State Constitution in making appropriations for legislative salaries. (New York Pub. Interest Research Group v Steingut, 40 NY2d 250 [1976].) It is the role of the courts to nullify legislative attempts to appropriate legislative salaries or expenses contrary to State constitutional limitations. (See, e.g., Peay v Nolan, 157 Tenn 222, 7 SW2d 815 [1928]; In re Advisory Opn. to Governor, 90 Fla 708, 107 So 366, 367 [1925]; Ashton v Ferguson, 164 Ark 254, 261 SW 624, 625 [1925] [question is "judicial” not "political”]; see, Annotation, Constitutional Inhibition of Change of Officers’ Compensation as Applicable to Allowances for Expenses or Disbursements, 106 ALR 779.)
Moreover, in the absence of a clear expression or unambiguous language to the contrary, a legislative act must be construed as consistent with constitutional prescriptions. (See, People ex rel. Postal Telegraph-Cable Co. v State Bd. of Tax Commrs., 224 NY 167, 182 [1918].) Respect for the Legislature as a constitutional equal compels the presumption that this general appropriation for "personal service” to the Senate was intended to authorize expenditures within the constitutional power of the Legislature, and no others. (See, New York State Coalition for Criminal Justice v Coughlin, 103 AD2d 40, 45-46 [3d Dept 1984], affd on other grounds 64 NY2d 660; compare, State ex rel. Banker v Clausen, 142 Wash 450, 253 P 805, 806 [1927]; State v Appling, 226 Ore 575, 361 P2d 86, 92-93 [1961].)
Therefore, to the extent that the expenditures by the defendants at issue here were not authorized by a legislative appropriation within constitutional bounds, the prosecution of defendants for making such expenditures cannot impair any legitimate constitutional function of the Legislature. As the Supreme Court noted, when dismissing a separation of powers argument against a suit for the politically motivated firing of government employees in violation of the First and Fourteenth Amendments to the US Constitution: "[T]here can be no impairment of executive power, whether on the state or *931 federal level, where actions pursuant to that power are impermissible under the Constitution. Where there is no power, there can be no impairment of power. And our determination of the limits on state executive power contained in the Constitution is in proper keeping with our primary responsibility of interpreting that document.” (Elrod v Burns, 427 US 347, 352-353 [1976].) These principles are equally applicable to actions of legislators in excess of legislative powers under our State Constitution.
It remains to be determined whether defendants’ expenditure of the funds appropriated for personal service to the Senate, to. pay salaries of persons engaged full time in political campaigning, violated constitutional limits as the People contend.
NY Constitution, article VII, § 8 states: "1. The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private undertaking”.
This provision derives from the "general rule that the legitimate object of raising money by taxation is for public purposes and the proper needs of government” (Weismer v Village of Douglas, 64 NY 91, 99 [1876]).[9] Stated otherwise "an exaction of money or property from one citizen and its appropriation to another for its private use * * * is not a valid exercise of taxing power” (Fox v Mohawk & Hudson Riv. Humane Socy., 165 NY 517, 526 [1901]). It is a judicial function to determine whether a challenged expenditure is for a public purpose (Weismer v Village of Douglas, supra, at 99; see, Common Cause v State of Maine, 455 A2d 1, 15-16 [Me 1983]) although courts generally will not interfere with the Legislature’s determination unless it is in clear violation of these principles. (Weismer v Village of Douglas, supra, at 99; Matter of Chapman v City of New York, 168 NY 80, 87 [1901].) Where as here there is no explicit statutory authority for the challenged expenditure, the court must look to the purpose to which the funds were applied to determine whether it complies with the constitutional limitation. (See, Matter of City of Mount Vernon v State of New York Bd. of Equalization & Assessment, 92 AD2d 985, 988 [3d Dept 1983]; Seif v City of Long Beach, 286 NY 382 [1941].)
*932 A public purpose within the Constitution has been defined as one "for the benefit and advantage of all of the public and in which all have a right to share” (Smith v Smythe, 197 NY 457, 464 [1910]; Weismer v Village of Douglas, supra; see also, Bowling v Brown, 57 Md App 248, 469 A2d 896, 902 [1984]). In the context of public employment, this means that salaries may not be paid from tax revenues unless the person receiving the money has furnished a corresponding benefit or consideration to the State. (See, e.g., Board of Educ. v Associated Teachers, 30 NY2d 122, 128 [1972].) Thus, where the State Legislature passed a statute requiring the City of New York to pay the salary of an elected District Court Judge to the estate of one Stemmier, from whom the office allegedly had been unlawfully usurped, the Court of Appeals declared the statute unconstitutional as an "attempted appropriation * * * to pay a claim not based upon services rendered to the city but for money never earned [which] cannot, we think, be said to be a purpose for the common good and general welfare * * * and, therefore, is not within the foregoing definition of a [public] purpose.” (Stemmler v Mayor of City of N. Y., 179 NY 473, 484 [1904].) Although Stemmier had the apparent sympathy of the Legislature, the court ruled that his political interests were not the public’s interest, since "when a citizen accepts a nomination for a public office, and is elected, he assumes the risk of defending himself against the unfounded accusations of another candidate, and incurs the risk of losing the salary during the time the office is occupied by his adversary.” (Supra, at 485; see also, Rice v State of New York, 55 Misc 2d 964 [Ct Claims 1968]; City of Mount Vernon v State of New York Bd. of Equalization & Assessment, 92 AD2d, supra, at 988.)
The State Comptroller has also consistently ruled that the Constitution prohibits assignment of public employees to private duties while on the public payroll. Thus, an attempt by the City of Yonkers to authorize its Chief of Police to assign off-duty officers to private concerns under contract was a gift of public resources in violation of the Constitution. (See, Matter of Cannavo v Regan, 122 AD2d 523, n [3d Dept 1986].) An agreement whereby the president of the Patrolmen’s Benevolent Association was relieved of police duties in order to devote himself full time to union activities, while remaining on the county payroll, constituted an unconstitutional gift of county funds. (24 Opns St Comp, 1968, No. 68-642, at 624.) In the absence of express or implied statutory authority, the *933 Comptroller ruled that assignment of county highway department employees to operate a food service commissary for the sole benefit of other highway maintenance employees during emergency snow removal was a prohibited use of county funds for a private purpose. (24 Opns St Comp, 1968, No. 68-480, at 486.) The State Comptroller also ruled that a city may not pay the expenses of its patrolmen in attending a Police Benevolent Association convention, since the Association was a private organization similar in purpose to a labor.union which existed for the private benefit of its members, and not to assist them in the performance of their official duties. (23 Opns St Comp, 1963, No. 67-375, at 315.)
There is also a clear line of precedent that partisan political activity is a private function, not a public purpose for which State funds may be constitutionally expended. State administrative agencies have been consistently enjoined by the courts of this State from expending State funds to support or to oppose referenda submitted for electoral consideration. In Stern v Kramarsky (84 Misc 2d 447 [Sup Ct, NY County 1975]), the court enjoined the defendant Commissioner of the State Division of Human Rights from "supporting, promoting, campaigning or otherwise acting to achieve passage of the proposed Equal Rights Amendment to the New York State Constitution at the election on November 4, 1975.” (Supra, at 453.) The basis for the court’s decision was NY Constitution, article VII, §8:
"[T]he State Government * * * must maintain a position of neutrality and impartiality.
"It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United States of America. This is true even if the position advocated is believed to be in the best interests of our country * * *
"Public funds are trust funds and as such are sacred and are to be used only for the operation of government * * * Improper expenditure of funds, whether directly through promotional and advertising activities or indirectly through the use of government employees or facilities cannot be countenanced. (NY Const, art VII, § 8; art VIII, § 1.) People of all shades of opinion and belief contribute these funds from one source or another.” (Supra, at 452.)
*934 The opinion in Kramarsky (supra) also refers to a previous decision of the same court enjoining the New York Transit Authority from permitting employees during hours when they were to perform their regular duties to put up placards and posters for a private organization advocating an affirmative vote on a transportation bond issue. Again, the injunction was based on the constitutional prohibition against private use of public money. (Matter of Olivieri [Ronan], NY County, index No. 23334; Stern v Kramarsky, supra, at 450-451; see also, Matter of Phillips v Maurer, 67 NY2d 672, 674 [1986].)[10]
These principles apply no less to the use of public funds to advocate the election of candidates of a particular political party over their political opponents. A political party is a private organization. (Democratic Party v Wisconsin, 450 US 107 [1981]; Cousins v Wigoda, 419 US 477 [1975].) While the Legislature has prescribed certain uniform structures of political party organization (Election Law art 2), the parties are not official or quasi-governmental creations of the Legislature. (Heydeman v County of Rockland, 206 Misc 473, 478 [Sup Ct, Rockland County 1954].) By definition, a political party, like a labor union, represents only a portion of the public. (See, e.g., People v Clampitt, 34 Misc 2d 766, 767 [Ct Spec Sess, NY City 1961]; see, Abood v Detroit Bd. of Educ., 431 US 209, 235-236 [majority opn], 259, n 13 [Powell, J., concurring] [1977]; Anderson v City of Boston, 376 Mass 178, 380 NE2d 628, 640 [1978].) The very purpose of party affiliation is to advance the political views and electoral fortunes of one faction of the public. (See, e.g., Matter of Zuckman v Donohue, 191 Misc 399, 407 [Sup Ct, Albany County 1948], affd 298 NY 627; Matter of Werbel v Gernstein, 191 Misc 275, 278-279 [Sup Ct, Kings County 1948].) In fact, the Election Law permits a political party to invoke the aid of the court to strike from its roles anyone who is not *935 in sympathy with the party’s political agenda. (Election Law § 16-110; see, e.g., Matter of Samuel v Rodriguez, 120 Misc 2d 964 [Sup Ct, NY County 1983]; Matter of Battipaglia v Executive Comm, of Democratic County Comm., 9 AD2d 774 [2d Dept 1959], affd 7 NY2d 976.)
The partisan political activities of members of the government are, moreover, distinct from the operation of government itself. (See, Elrod v Burns, 427 US, supra, at 364-367.) The status of incumbency does not confer the mantle of governmental authority upon the partisan political acts of elected public officials. "It is not the function of the government to get itself reelected” (Emerson, System of Freedom of Expression 699 [Vintage Press 1970]; see, Anderson v City of Boston, supra, 380 NE2d, at 639, n 16). On the contrary "[a] principal danger feared by our country’s founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 J. Richardson, Messages and Papers of the Presidents (1899) pp. 98-99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process” (Stanson v Mott, 17 Cal 3d 206, 217, 551 P2d 1, 9 [1976], supra [referring to a referendum campaign]). Thus, it has been held to be an improper exercise of the legislative power to assist the reelection of incumbents by requiring that their names appear at the top of the printed ballot. (Matter of Holtzman v Power, 62 Misc 2d 1020, 1024 [Sup Ct, NY County 1970], affd 34 AD2d 917 [1st Dept 1970], affd 27 NY2d 628.) Of course, the political program of a party elected to government may be of consequential benefit to the whole public, but such benefits derive directly from the operation of the government and only incidentally from partisan electoral activities. (See, Weismer v Village of Douglas, 64 NY, supra, at 100.)
Therefore, the court holds that the defendants’ alleged expenditure of funds appropriated for salaries of Senate staff to pay persons employed to work in political campaigns was not a legislative function deserving constitutional protection from judicial interference, but was an unconstitutional private application of public revenue.[11] At least one other court has so
*936 ruled. In Fair Political Practices Commn. v Suitt (90 Cal App 3d 125, 153 Cal Rptr 311 [1st Dist 1979]) a California intermediate Court of Appeal held under the California Political Reform Act (Govt Code § 81000 et seq.) that the use of a State legislative employee to plan campaign strategy, solicit contributions, coordinate volunteers and prepare the campaign budget for reelection of a State Assemblyman, was a nonmonetary contribution to the political campaign in the form of personal services, which had to be publicly disclosed. In response to the argument that the act was intended to apply only to contributions by private entities, the court held: "that contributions by governmental entities to political campaigns are per se illegal. Gifts of public money to private persons, associations, or corporations are prohibited by * * * the California Constitution * * * It was thus inconceivable * * * to the draftsmen of the initiative measure, and to the electorate, that public funds would be expended by or for the benefit of certain legislators to reelect themselves rather than their adversaries. Hence the need to specify such a proscription in the Act would have been deemed unnecessary, and even demeaning to lawmakers and pubic employees generally”. (Supra, 90 Cal App 3d, at 132, 153 Cal Rptr, at 315; Cal Const, art XVI, § 6.) The Attorney-General of the State of Washington reached the same conclusion under a similar provision of that State’s Constitution. (King County Council v Public Disclosure Commn., 93 Wash 2d 559, 564, 611 P2d 1227, 1230 [1980] ["The attorney general has advised that state expenditures for an individual’s candidacy would not be for a public purpose”]; Wash Const, art VII, § 1, Amend 14.)
*937 THE QUESTION OF STANDARDS
The defendants’ second and third formulation of the political question doctrine are essentially related. The issue is whether standards exist within judicial competence to distinguish proper legislative duties from allegedly improper political acts, or would an act of judicial legislation be required to derive such standards.
Defendants, taking the latter position, cite United States ex rel. Joseph v Cannon (642 F2d 1373 [DC Cir 1981]), in which the court affirmed the dismissal of a suit, under the Federal False Claims Act (31 USC former § 231), against a Senator to recover salary paid to a Senate aide who accepted " 'his regular pay for services ostensibly performed as [the Senator’s] administrative assistant’ ” even though he "completely disregarded [those] duties” while working in the Senator’s reelection campaign. (642 F2d, supra, at 1375, 1378.) The court held that the issue presented a political question incapable of judicial resolution, since there was no statutory, administrative or judicial guidance "whether campaign work is official activity” within the intention of legislative appropriations for the " 'compensation of officers, employees, [and] clerks to Senators’ ” (supra, at 1380). In seeking standards by which to resolve the issue, the court reviewed the history of Senate debates, committee studies, and proposed rules. The court noted that the Senate had been unable to formulate guidelines. The court referred to remarks of Senators in debate that staff were indispensable to "work[ing] up the facts on which the Senator acts”, which acts directly affect the Senator’s reelection prospects. (Supra, at 1380-1381, n 60). This was the basis for opposition to legislation that would have barred Senate staff from having anything to do with a Senator’s reelection campaign. The court also reviewed the results of a recommendation by the Senate Committee on Official Conduct to remove staff from the Senate payroll "if they are engaging in substantial campaign activities on behalf of the reelection effort of the Senator for whom they work”, qualified by exemption for "political activity directly related to * * * official duties”. (Supra, at 1381, and n 66.) The recommended rule provision was deleted in favor of further study of workable standards. The study resulted in a declaration of the preexisting rules that members of a Senator’s staff are permitted to engage in reelection campaigns as long as staff do not "neglect [their] Senate duties” which are discretionary with *938 the Senator but which "necessarily encompass political and representational responsibilities as well ^s legislative * * * ones, and are often performed during irregular and unconventional work hours” (supra, at 1383). The court held that there was neither a discernable legal standard nor even a congressional policy determination by which to resolve the issue whether "action taken by a Senator and his aid * * * is sufficiently 'official’ or too 'political.’ ” (642 F2d, supra, at 1384.)[12]
The Cannon court relied in large part on a prior decision of that circuit dismissing, for "lack of standing and prudential concerns”, a suit by supporters of a rival Presidential candidate against assistants to President Carter and executives of the President’s reelection campaign. (Winpisinger v Watson, 628 F2d 133 [DC Cir 1980].) In Winpisinger, plaintiffs sought an injunction against, inter alia, "a concerted course of conduct [by Presidential subordinates] designed to use the public treasury for salaries, travel expenses, costs of meetings and other political outlays * * * to obtain support for President Carter’s renomination.” (628 F2d, supra, at 135.) The "prudential concerns” cited were that "the court * * * would have to inject itself into practically every facet of the Executive Branch of the federal government, on a continuing basis, for the purpose of appraising whether considerations other than pure public service motivated a particular defendant- in the performance of his or her official duties * * * and [a] resultant shift of such decisionmaking from the Executive to the Judicial Branch.” (Supra, at 139-140.) The court noted that such judicial intervention would violate several formulations of the *939 political question doctrine, in that it would "necessarily carry with it an implied lack of respect for a coordinate branch of government, in addition to being unmanageable. Neither would that inquiry proceed on the basis of a discrete judicial standard”. (628 F2d, supra, at 140, n 30.)
The People urge this court to distinguish Cannon and Winpisinger (supra) on the ground that our State Constitution, by prohibiting the appropriation of State funds to private purposes, establishes a standard within judicial cognizance, unavailable to Federal courts.
The court finds that judicial construction of NY Constitution, article VII, § 8 does provide discernible standards relevant to the use of State funds for political purposes. This construction does not, however, address all of the concerns present in the Cannon or Winpisinger opinions (supra).
The defendants’ apparent position that legislative duties are not susceptible of distinction from political acts is incorrect. The Legislature .has drawn such distinctions frequently, in various legislative enactments, and has done so in a manner that assumes the terms "legislative function” and "political” conduct are generally so well understood as not to require specific definition.
The Civil Service Law which, inter alia, prohibits patronage practices in regard to civil service employment (Civil Service Law § 107) is specifically inapplicable to officers and employees of the State Legislature[13] "and all officers and employees of any other legislative body whose principal. functions and duties are directly related to the performance of the legislative functions of such body” (Civil Service Law § 35 [c]). Thus, *940 the Legislature left it to the courts and, where appropriate, administrative agencies to determine whether a particular county or municipal employee’s "duties are directly related to the performance of * * * legislative functions”. (See, e.g., Matter of O’Grady v Polk, 132 App Div 47 [2d Dept 1909]; 1939 Opns Atty Gen 158-159.) The same law protects civil servants from being compelled "to render any political service” or "to make any contribution of money or service * * * for any political purpose.” (Civil Service Law § 107 [1].) The Legislature did not find it necessary to define the term "political” in these sections. In the Election Law, the Legislature defined " 'political committee’ ” to mean "any * * * combination of * * * persons operating or cooperating to aid or to promote the success or defeat of a political party or principle, or of any ballot proposal; or to aid or take part in the election or defeat of a candidate for public office or * * * for nomination * * * or of a candidate for any party position * * * but [not] * * * the discussion or advancement of political questions or principles without connection with any vote”. (Election Law § 14-100 [1].) The definition of " 'contribution’ ” within the same section includes "compensation for the personal services of any individual which are rendered in connection with a candidate’s election or nomination without charge” (Election Law § 14-100 [9] [3]). By contrast, the Public Officers Law recognizes as among the official acts, duties and discretion of members, officers and employees of the Legislature, "approving or promoting the passage of legislation or resolutions or the confirmation of appointees, or the conduct of investigations” (Public Officers Law § 77) and "acting as a public advocate whether or not on behalf of a constituent” (Public Officers Law § 73 [7] [d]).
This court does not intend to imply that the foregoing statutory provisions are the law of this case, but cites these provisions only to demonstrate the judgment of the Legislature that courts are able to distinguish legislative functions from political acts. Moreover, courts are often required under statutes of general application to determine whether particular conduct constitutes official action of a legislator. For example, the bribery statute makes it unlawful for a public servant, including a State legislator, to accept a benefit under agreement that a "vote, opinion, judgment, action, decision or exercise of discretion” will thereby be influenced. (Penal Law § 200.10.) Under this statute, courts have held that "[t]he official duties of a legislator include the conduct of and partici *941 pation in legislative investigations; discussion, persuasion and the influencing of other legislators; and the exercise of a power or authority derived from the actual relationship between a legislator as legislator and a particular matter” (People v Adams, 86 Misc 2d 634, 637 [Suffolk County Ct 1976]; see also, People v Ginsberg, 80 Misc 2d 921, 927-929 [Nassau County Ct 1974], affd on other grounds 50 AD2d 804 [2d Dept 1975]). Other statutes require similar judicial determinations. (See, e.g., People v Blumenthal, 55 AD2d, supra, at 15; Penal Law §§ 200.25 [official misconduct], 200.35 [unlawful gratuities].)
Nor is it a novel proposition, insofar as legislative powers are concerned, that standards be derived from the State Constitution. The Constitution serves to delimit legislative authority which is otherwise plenary. (See, e.g., Matter of Doyle, 257 NY 244, 270-271 [Pound, J., dissenting in part] [1931].) Thus, courts interpreting provisions of the State Constitution have been required to determine whether duties statutorily delegated to legislative leaders are "such as may be properly attached to the legislative office” or amount to "civil appointment” requiring an exercise of nonlegislative powers constitutionally prohibited to sitting legislators. (People v Tremaine, 252 NY 27, 40-45, supra; NY Const, art III, § 7.) Courts of virtually every jurisdiction have also had to decide under various provisions of their individual Constitutions whether appropriations for legislators’ expenses are within the legislative power to reimburse members for expenses incurred while performing legislative duties, or are attempts. to increase legislators’ compensation beyond constitutional limits. In order to make this determination, courts must decide what are legislative, as opposed to personal and, indeed, political activities. (See, e.g., Spearman v Williams, 415 P2d, supra, at 601; In re Advisory Opn. to House of Representatives, 485 A2d 550 [RI 1984]; Opinion of Justices, 159 Me 77, 190 A2d 910 [1963]; Manning v Sims, 308 Ky 577, 213 SW2d 577, 585-586 [1948]; State of N. Dakota v Guy, 107 NW2d 211, 216 [ND 1961].) At least one court has held that a lump-sum appropriation for official legislative expenses unrelated to actual costs of performing legislative duties would constitute a gift of public funds in violation of a constitutional provision similar to NY Constitution, article VII, § 8. (Peay v Nolan, 7 SW2d 815, 817-819, supra.)
Accordingly, this court also holds that our State Constitution, as construed by the courts of this State, provides an *942 appropriate source of standards by which limitations on the legislative function may be judicially determined. (See, Baker v Carr, 369 US 186, 211, supra; Powell v McCormack, 395 US 486, 548-549 [1969].)
It is not necessary to repeat here the previous analysis of cases decided pursuant to NY Constitution, article VII, §8 which support the principle that partisan political campaign activities for the purpose of securing the election of party candidates to legislative office is a private, not a governmental, function.[14] One aspect of the previous analysis, however, deserves further comment. Unlike State administrative agencies, a State legislator has a representational function as advocate for that portion of the electorate which is his or her constituency. Also unlike agency administrators, a legislator must necessarily be involved in the partisan political process in order to be elected to the office. Both courts and the Legislature recognize that there is a distinction between the representational and the political function, but that distinction is not always easily discernible. (See, e.g., Temple v Brooks, 165 App Div 661 [3d Dept 1915]; Stanson v Mott, 17 Cal 3d 206, 551 P2d 1, 12, supra; Fair Political Practices Commit, v Suitt, 90 Cal App 3d 125, 153 Cal Rptr 311, 315, supra; Note, Use of Congressional Staff in Election Campaigning, 82 Colum L Rev 998, 1024-1027 [1982].) The Legislature acknowledged this when it promulgated as an interim rule, in April 1987, that "no person shall be hired by the Legislature to engage solely in political campaign activity” but that "official duties [of legislative employees] may include, by way of example only, representational activities, such as constituent casework, preparation of news releases and newsletters to constituents, public appearances and other responsibilities which are not political campaign activity” (Senate Resolution 812-87, at 2, ¶¶ 3, 4 [Apr. 8, 1988]).
A 1945 legislative commission report, recommending against extending civil service status to legislative employees (see, Civil Service Law § 35 [c]), made the following observations:
"[Legislative personnel must * *• * be recruited from groups *943 sympathetic to a legislator’s program * * * Under our theory .of government where party programs have been the basis for legislation, it might hamstring a legislator to surround him with employees unsympathetic to his point of view or to whom party strategy cannot be confided.
"A legislator demands party workers who are alert to the issues of the day, who have faith in his program and will work into the night to build that program. In addition, to render his task efficiently, the legislator finds it important to recruit personnel from his own area who know local problems and local constituents * * * [C]ivil service employees would not be free to participate in the political activity generally required of a legislator.” (Report of Joint Legis Comm on Methods, Practices, Procedures and Expenditures, 1945 NY Legis Doc No. 35, at 31-32, citing Civil Service Law former §§ 25, 26; see, Civil Service Law § 107 [1], [3].)
Certainly, there is nothing illegitimate about the role of the Senate Minority Leader as coordinator of the minority party’s political and legislative strategy within the Senate. Nothing could be clearer from the previous discussion than that the function of the Senate Minority Leader’s office, the delegation of duties by the Minority Leader, and the execution of those duties by the Leader’s staff are beyond the power of courts to examine, much less to dictate. (Matter of Gottlieb v Duryea, 38 AD2d 634, supra.) Neither may the executive nor this court arrogate to itself the authority to prohibit the Minority Leader from assigning staff to coordinate with Democratic Party leaders in developing a legislative strategy, to poll constituents to determine their views of the Senate minority’s program, or to engage in the myriad political activities through which constituents may influence and legislators may explain or garner support for legislation. (See, e.g., United States v Brewster, 408 US, supra, at 512; United States ex rel. Joseph v Cannon, 642 F2d 1373, supra.) It is a basic tenet of our system of government that legislation and legislators should reflect the popular will, which is primarily manifested through the competitive political process. Therefore, the line between partisan political action and constituent representation is and should be elastic, and is not subject to judicial or executive fiat. Whether and to what extent the process of forging a popular consensus in support of a legislative agenda may be distinguished from the promotion of a party’s or an individual’s political aspirations is a difficult issue, requiring factual determinations and policy decisions that are beyond *944 the competence of courts to decide within the limits of a particular controversy. (Yudof, When Governments Speak: Toward a Theory of Government Expression and the First Amendment, 57 Tex L Rev 863, 912-917 [1979]; compare, Rapp v Carey, 44 NY2d 157, 165 [1978] [restriction on public employees’ holding party office was legislative, not executive, function]; LaFalce v Houston, 712 F2d 292 [7th Cir 1983], cert denied 464 US 1044 [1984] [courts will not intervene to prohibit political consideration in awarding public contracts].)
Similarly, there is obviously nothing either illegitimate or unconstitutional in a Senator’s endorsement or active support for a political issue, party or even candidates in a Senate election campaign. Legislators not only may, but must, actively engage in partisan politics while receiving their government salary. Any legislator speaks simultaneously as lawmaker, representative, party member and politician. (Yudof op. cit., 57 Tex L Rev, at 904-905.) And members of a legislator’s staff, as individuals, not only enjoy the same privileges as any other citizen to engage in political debate and to support political candidates, but have a heightened political interest insofar as their employment depends upon the political fortunes of the elected member for whom they work.[15] (See, e.g., Davis v Passman, 442 US, supra, at 249-250 [dissent of Burger, Ch. J.].)
A distinction can be made, however, between efforts by the organized Senate minority to forge a political cpnsensus to support the party’s legislative program, or the individual endeavors of legislative employees on behalf of the political party, issue or candidate of individual choice, and the conduct of an organized campaign by the Senate minority to elect particular persons to legislative office. (See, Note, op. cit., 82 Colum L Rev, at 1024-1027.) This distinction, moreover, must be made if the Constitution is to be upheld. The Legislature, as a body, is restrained by the Constitution from appropriating State funds for the purpose of electing preferred candidates to the ranks of its membership. The basis of this restraint is simply that the election of a particular person to political office is not a function of the government. Consequently, it is not possible to render a service to the Legislature as a branch of government, by performing work which is only useful in the election of a candidate to legislative office, and which serves no other end. (Compare, Hoellen v Annunzio, *945 468 F2d, supra, at 527; Belardino v Murphy, 364 F Supp 1223, 1224 [SD NY 1972] [mail to "prospective” constituents cannot qualify for congressional frank].) This court, accordingly, agrees with the observation that "use of state employees by a legislator’s campaign committee to solicit contributions, plan campaign strategy, coordinate volunteers, and prepare the campaign budget, all at state expense, is in no way a proper part of a legislator’s official functions” (Fair Political Practices Commn. v Suitt, supra, 90 Cal App 3d, at 130, 153 Cal Rptr, at 314).[16]
APPLYING THE STANDARD
The Constitution at once establishes the power of the Legislature over appropriations and over the salaries and working hours of State government employees, and limits this power by its prohibition against applying State funds to the exclusive benefit of private interests. (NY Const, art VII, §§ 7, 8; art *946 XIII, § 14.) The court has held that this limitation prohibits the expenditure of State funds to pay for work which is only useful in the election of a candidate to the legislative office. This constitutional limit necessarily applies to the assignment of tasks to Senate staff by the Minority Leader and by the other defendant Senators. Ordinarily, the function and duties of the staff of the Senate is a matter protected from judicial or executive interference by the separation of powers doctrine. It . remains to be considered to what extent the judicial process can, with due respect for the Legislature as a coordinate branch of government, distinguish which functions of the Senate minority staff were useful only in the election of political candidates; which Senate minority employees performed such functions; and whether that performance occurred during time periods when these employees were being paid to perform official duties on the State payroll.
The testimony before the Grand Jury of every Minority Conference staff member whose employment is at issue established that none (with the exceptions previously noted supra, at 922-923) performed any work between the legislative recess in late June 1986 and the 1986 election, except in furtherance of the election of Democratic Senate candidates. In addition to those three as to whom there was evidence of commission work (supra, at 923), there was evidence that Pauline Toole assigned to the Oppenheimer campaign, and Diane DeVito assigned to the Quattrociocchi campaign, performed some constituent service work along with campaign duties. Notwithstanding the absence of any work of benefit to the Legislature, to constituents, or to commissions by 31 of these 36 employees,[17] the defendant Senators continued to certify to the Senate, at biweekly intervals, that these staff had "actually performed the proper duties of the position [identified by title] for the period specified” in the payroll certification form. (Supra, at 912.) Thus, the constitutional standard would seem to have been met as to these 31 employees during this six-month period.
In spite of the syllogistic appeal of this result, the court finds that the constitutional standard cannot be so categorically applied. An alleged violation of the separation of powers doctrine requires "discriminating inquiry into the precise facts and posture of the particular case and [is] impossible] of *947 resolution by any semantic cataloguing” (Baker v Carr, 369 US, supra, at 217).
Pursuant to its constitutional powers (NY Const, art VII, § 7; art XIII, § 14), the Legislature passed appropriations for legislative staff salaries in broad categories: for "personal services of employees and for * * * services of legislative and program operation * * * personal services of employees and * * * for services of standing committees”. The Legislature, by statute, delegated to the Minority Leader to appoint staff as authorized in this legislative appropriations bill (Legislative Law § 6 [2]). Incident to this power of appointment is the statutory power to set amounts of compensation (Legislative Law § 10) and periods of employment (Legislative Law § 11). The Minority Leader is thus empowered to establish rates of compensation for those employees appointed.
The Legislature has also, on occasion, formally declared its staffing needs and employment practice.[18]
In the concurrent resolution of April 1987, the Legislature declared: "[T]he needs of Legislators and of the Legislature vary from time to time, and * * * Legislative staff may therefore be required to work irregular hours and periods of time. Considering the fact that Legislative Employees frequently perform their official duties for longer hours during certain periods of time, the time that a Legislative Employee is not required to perform such official duties frequently occurs when the Legislature is not in active session and may occur at other periods of time * * * No precise job descriptions are in force for such employees.” (Senate Resolution 812-87, at 1, ¶ 5; at 2, ¶ 3 [Apr. 8, 1987].)
The 1945 Report of the Joint Committee on Legislative Procedures and Expenditures reviewed legislative staffing policies in detail. Among the committee’s findings of consequences to this prosecution were the following accounts of the temporal requirements of legislative employment: "During the first half of the legislative session it would appear to one unfamiliar with the legislative process in New York, that there are a number of employees on the payroll with little to do. That *948 condition has its roots in the procedure of the New York State Legislature and not, as has been assumed by some, in devious malpractices. The fact of the matter is that the legislative work force must be built up and geared to handle the peak load of bills that confronts the Legislature during the closing weeks of the session.” (1945 NY Legis Doc No. 35, at 33.) "The nature of operations is such that the legislative staff must be geared to plan for and meet the rush and peak activity which comes about toward the end of the session. Obviously it would be impossible to hire experienced employees for the closing weeks of the session. The full complement must be recruited at the beginning of the session with full knowledge that the Legislature will be unable to get maximum use out of these employees until the end of the session.” (Id., at 36.)
"The legislative budget has run to extreme in appropriations for personal service. It has either inflexibly lined out salaries for certain position; i.e. stated a job title and salary for the job, or it has made available large unitemized lump sums.
"It seems to have been an inherited practice of legislative officials to utilize the line items in the budget before drawing upon lump sum appropriations for particular jobs. This has resulted at times in the use of line item salaries to pay for jobs with duties often entirely different from what the line item called for. The State has not lost any money thereby, but the practice has resulted in confusion and has provided a basis for suspicion and criticism. For example, * * * [t]he 'general clerk’ designation has covered a variety of jobs including messenger, stenographer, doorkeeper, research clerk, chauffeur, assistant postmaster. The payroll title 'committee messenger’ has included document room clerk, research clerk, doorkeeper, assistant janitor, and stenographer.” (Id., at 38.)
In addition to these legislative declarations, it should be noted that the Legislature is empowered to create, and to appropriate funds for, the continuation of investigatory commissions during periods when the Legislature itself is not in session, and between regular sessions of the Legislature. (See, People ex rel. Hastings v Hofstadter, 285 NY 425, 432 [1932]; People v Backer, 113 Misc 400, 403 [Ct Gen Sess, NY County 1920].)
Thus, in addition to the Minority Leader’s statutory powers, *949 it is apparent that the Leader and other Senators have broad discretion to determine the schedules, attendance and duties of legislative employees. The Legislature also permits members with appointing power, such as the Minority Leader, to use budget lines interchangeably. Therefore, there is no requirement that an employee perform the specific duties of the position to which the employee was appointed. (1945 Legis Doc No. 35, at 38.) In any event, the Legislature has declared that there are no specific job descriptions, and evidence establishes that it is left to the appointing member to define job titles and responsibilities.
Given these circumstances, the statement in the payroll certification form that a named employee has "performed the proper duties of the position” expresses nothing other than the member’s authorization to pay for work which, in the judgment of the certifying member (or member’s designee), is of value to the Legislature and authorized by appropriation. Given the member’s authority to determine rates of compensation and hours of employment, and the absence of standard vacation or compensatory time practices, the certification that an employee has performed such duties "for the period specified” must be broadly construed to include entitlement to salary for the previous performance of services of value to the Legislature.
The Legislature has also left it to the Minority Leader to determine when staff will be hired, how many staff are needed, and how long they will be retained, as long as there are appropriated funds available for salaries (Legislative Law § 6 [2]; § 11). Therefore, the Minority Leader is authorized to hire staff or to retain previously hired staff intersession, and during periods of inactivity, in anticipation of the continuing or future needs of the Senate’s minority members.
What the Legislature has expressly not done is to grant statutory authority or standards to the courts to review this exercise of discretion by its members. (Cf., e.g., United States v Eilberg, 507 F Supp 267, 287, supra; Schiaffo v Helstoski, 350 F Supp 1076, 1084-1085 [D NJ 1972].) The payroll certification’s affirmation clause (see, supra, at 912, n 2) does not constitute a legislative concession to judicial review. (See, NY Const, art III, § 9; compare, Consumers Union v Periodical Correspondent’s Assn., 515 F2d, supra, at 1346-1351.) Even though members of the Legislature may abuse the discretion *950 thereby granted,[19] the potential for such abuse is not a sufficient predicate for this court to cross the line of separation between the legislative and judicial function (compare, United States v Brewster, 408 US, supra, at 517), or to assume authority to administer the Legislature’s internal affairs. (Compare, Public Citizen v Simon, 539 F2d 211, 217 [DC Cir 1976] [taxpayer denied standing to compel court to review spending of salaries for executive White House staff to work full time in the President’s reelection campaign]; Winpisinger v Watson, 628 F2d, supra, at 139-141.)
The separation of powers doctrine recognizes that each branch of government has an obligation to uphold constitutional standards. (See, e.g., People v Barber, 289 NY 378, 385 [1943].) Although it is the judiciary’s function to declare those standards, the doctrine requires a presumption that other branches will meet their constitutional obligation in matters committed by the Constitution to their discretion, or necessary to the performance of their constitutional function (see, Powell v McCormack, 395 US, supra, at 549, n 86). This presumption applies to the execution of official responsibilities by individual members of the Legislature, as well as to official acts of the Legislature itself. (See, e.g., State v Appling, 226 Ore 575, 361 P2d 86, 92-93 [1961], supra; In re Advisory Opn. to House of Representatives, 485 A2d 550, 555 [RI], supra.) This presumption may be overcome only by clear evidence of conduct patently contrary to constitutional limitations upon legislative authority (see, e.g., Peay v Nolan, 7 SW2d 815, 818, 820, supra).[20]
These principles are illustrated by the Court of Appeals decision in New York Pub. Interest Research Group v Steingut (40 NY2d 250 [1976]). In Public Interest Research Group, the court declared that the Legislature’s continuous practice of altering by annual supplementary appropriations bills, the *951 amount of particular and additional allowances in excess of a legislator’s salary, violated the Constitution’s explicit prohibition against increasing or diminishing a legislator’s salary or allowances during the legislator’s term of office (NY Const, art III, § 6). The court ruled that such allowances had been " 'fixed’ ” within the meaning of the Constitution by the appropriation first enacted within the legislator’s term of office, even though the appropriation came at the end of a legislative session. (40 NY2d, supra, at 259.) Significant to the present discussion was the court’s refusal to review "[t]he detailed correlations between recipients of allowances in different years”, in order to remedy the constitutional violation. (Supra, at 260.) The court’s deference was based on "our conclusion that determinations as to [the] identity of offices benefited is a legislative prerogative, exercised by that body 'in the discharge of its own functions and peculiar duties’ and should normally be free from interference by other branches of government (Matter of Gottlieb v Duryea, 38 AD2d 643, affd 30 NY2d 807, cert den 409 US 1008).” (40 NY2d, supra, at 260.) Of equal significance was the court’s refusal to avoid its own constitutional responsibility by adopting the Legislature’s suggestion that comparisons be limited to total gross appropriations for legislative allowances in each fiscal year. The court declared that such a practice would defeat the very purpose of the constitutional proscription. (Supra, at 260.)
What is significant about the holding in Public Interest Research Group (supra) is not that there was a textual constitutional commitment of the issue of legislative allowances to the Legislature (cf., Saxton v Carey, 44 NY2d 545, supra), but that the court effectively left it to the Legislature to enforce the Constitution’s limitation upon the legislative power.
The evidence herein does not establish so patent a violation of the constitutional limitation on appropriations of public money for private purposes, as to justify prosecution of members of the Legislature for unauthorized and illegal use of legislative funds in regard to those legislative employees who performed services of value to the Legislature, either prior or subsequent to the 1986 election. Prosecution for employment of this nature raises nonjusticiable questions regarding the internal administration of the Legislature’s staff, which is in an area peculiarly within the prerogative of the Legislature protected by the Constitution from executive or judicial interference.
Therefore, the court dismisses counts based on the employ *952 ment in the 1986 campaign of those who rendered services of value to the Legislature prior to (category 1) or subsequent to (category 2) the campaign. The court also dismisses the defrauding the government (Penal Law § 195.20) count, which is based on the two-month hiatus of all work between the end of the 1986 election and the beginning of the 1987 legislative session.
The separation of powers doctrine does not require judicial deference to a patently unconstitutional and obviously unauthorized use of legislative appropriations. (See, Burt v Blumenauer, 299 Ore 55, 699 P2d 168, 178, supra [broad grants of authority cannot justify otherwise unlawful or unconstitutional expenditures].) Courts will not assume that the Legislature has authorized its members to act in patent violation of its constitutional powers. It is a patent violation, of our State Constitution to pay legislative salaries for work which is of no value to any purpose but the election of a political candidate, and to a person who has never performed any service of value to the Legislature or to any legislator in an official capacity. This practice finds no authorization in any legislative appropriation, statute, rule, resolution or even custom. In terms of legislative authority, it is no different from paying legislative salaries to those who perform no work at all. Both uses of the Legislature’s payroll exceed the Legislature’s constitutional powers of appropriation and, a fortiori, the authority of its members. It, therefore, entails no lack of respect for the Legislature or undue intervention into that branch’s constitutional prerogative for the executive to invoke the aid of the judicial process to apply constitutional standards in prohibition of this practice.
Accordingly, counts based on the use of the legislative payroll to pay those who performed no function other than to promote the election of Democratic Senate candidates for the duration of the 1986 political campaign are sustained (category 3).
The indictment is sustained except to the extent indicated herein. The court has addressed in this opinion only those issues relevant to its jurisdiction. Other issues raised by the defendants will be addressed in a subsequent opinion. As to the jurisdictional issues, the foregoing constitutes the opinion, decision and order of the court.
[Portions of opinion omitted for purposes of publication.]

. Counsel for the Senate and for the Assembly have also filed briefs, as amicus curiae, in support of defendants’ motion to dismiss the prosecution on jurisdictional grounds.

. The full text of the certification reads as follows:
"To the Senate Majority Leader: This is to certify that the persons named in the payroll listed above are employed by the New York State Senate in the position specified and have actually performed the proper duties of the position for the period specified. I further authorize the mailing of checks to employees listed under Mailing Authorization. I affirm that the employees listed are assigned to me and that this payroll certification is correct.
"Senator/Dept. Head’s Signature Date”

. Unless otherwise noted, amicus’ and defendants’ arguments are considered together.

. Article I, § 6 of the US Constitution states, in relevant part: "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place.”

. The courts also clearly are unable to examine the specifics of an employee’s activities in deciding cases of discrimination in hiring; but have done so in context of reviewing claims of legislative immunity with respect to firings.

. There was evidence that two of these staffers performed some work other than campaigning. (See, infra, in text.)

. Many of these staffers had been on other Senate staffs or on commis *923 sion staffs prior to joining the Minority Leader’s staff. In that capacity they may have assisted in drafting legislation, preparing committee hearings and reports, or in similar duties.

. There was evidence that three of these staffers performed some work other than campaigning. (See, infra, in text.)

. Many of the cited cases were decided under a provision of the Constitution, parallel to NY Constitution, article VII, §8, that limits the power of local governments to "give or loan any money or property to or in aid of any individual, or private corporation or association, or private undertaking”. (NY Const, art VIII, § 1.)

. These decisions are consistent with the holdings of courts in virtually every jurisdiction to consider, the question. In all cases, courts have held that public officials have no discretion to expend funds appropriated for general agency purposes, or to assign public employees during working hours, to advocate a partisan view of referendum measures. Although the narrow holding in these cases has been that a general appropriation confers no explicit authority from the Legislature to so expend public funds, the courts in every case have recognized that the partisan nature of such expenditures casts doubt upon the constitutional authority of the government to so use revenues raised by taxation. (Burt v Blumenauer, 299 Ore 55, 699 P2d 168, 180 [1985]; Anderson v City of Boston, 376 Mass 178, 380 NE2d 628, 637 [1978]; Stanson v Mott, 17 Cal 3d 206, 551 P2d 1, 10 [1976]; Citizens to Protect Pub. Funds v Board of Educ., 13 NJ 172, 98 A2d 673, 677 [1953].)

. Defendants assert that the consequence of this holding would be to render legislation for the public financing of political campaigns impossible under our State Constitution. While the court cannot express an advisory *936 opinion as to the constitutionality of prospective legislation, it should be emphasized that the holding in this case is limited to partisan use of the public treasury. Public financing for election campaigns has been, upheld against constitutional challenge expressly because the legislation at issue was evenhanded in administration and nonpartisan in effect, providing benefits on a voluntary basis to any candidate who demonstrates a threshold level of public political support. (Buckley v Valeo, 424 US 1, 91-96 [1976]; Greenberg v Bolger, 497 F Supp 756, 781 [ED NY 1980]; see, Comment, Buckley v Valeo: The Supreme Court and Federal Campaign Reform, 76 Colum L Rev 852, 885-890 [1976]; Note, Developments — Election Law, 88 Harv L Rev 1111, 1235, and n 5 [1975].) It does not follow from this court’s holding that a law allowing the State to assist evenhandedly to finance legislative campaigns of all candidates meeting nondiscriminatory and well-defined criteria would not serve a public purpose. On the contrary, the prevention of undue influence upon elections by the use of large sums of money has long been recognized as a governmental purpose beneficial to the entire electorate. (See, Van Ingen v Star Co., 1 App Div 429, 431-432 [1st Dept 1896], affd 157 NY 695 [1898].)

. The Cannon opinion was careful to note that "we do not, of course, say that Members of Congress or their aides may defraud the Government without subjecting themselves to statutory liabilities.” (United States ex rel. Joseph v Cannon, 642 F2d 1373, 1385.) The problem presented in Cannon was that representational activities of a legislator and his or her staff necessarily involve political aspects. This distinguishes Cannon from other cases in which Congressmen were prosecuted for paying legislative salaries to aides who performed only personal services (United States v Diggs, 613 F2d 988 [DC Cir 1979]) or no service (Bramblett v United States, 348 US 503 [1955]; United States v Diggs, supra, at 1002; People v Hochberg, 87 Misc 2d 1024 [Sup Ct, Albany County 1976]). Also distinguishable are cases involving government officials who have no official representational function. (Cf., e.g., Board of Chosen Freeholders v Conda, 164 NJ Super 386, 396 A2d 613, 616-617 [1978] [Surrogate, although elected, could not use staff for political errands]; United States v Pintar, 630 F2d 1270, 1281-1282 [8th Cir 1980] [embezzlement conviction for salaries of secretaries in administrative agency assigned exclusively to political campaign work].)

. Partisan political conduct by State employees, such as active participation in political management and campaigns directed toward political party objectives, and in fund raising for a candidate or political party, may be barred in the interest of governmental fairness and efficiency consistently with the First Amendment to the US Constitution (United Pub. Workers v Mitchell, 330 US 75, 99-100 [1947]; Civil Serv. Commn. v Letter Carriers, 413 US 548, 556 [1973]). Our State Legislature has chosen to exempt legislative staff from civil service classification and has not otherwise specifically prohibited campaign activities by legislative staff. That choice, however, does not compel the conclusion that legislative employees are authorized to engage in partisan campaign activities while on the State payroll to the neglect of their legislative duties, or that the legislative payroll may be used to pay salaries to persons who do nothing other than work in political campaigns. As previously noted, in the absence of a clear expression to the contrary, the court cannot assume that the Legislature intended to authorize unconstitutional acts. (NY Const, art VII, § 8.)

. Even were the practices at issue employed simultaneously by both major parties in every legislative election (which was not established by evidence before the Grand Jury), such a "customer does not amount to a concession of power to the Legislature * * * or to a practical construction of the Constitution” (People v Tremaine, 252 NY 27, 47 [1929]). No "practice, however widespread, would serve to overturn a constitutional provision” (Schieffelin v Hylan, 236 NY 254, 264 [1923]).

. See, n 13, supra.

. This holding does not curtail the First Amendment rights of political association and speech of legislators or legislative staff employees (see, Elrod v Burns, 427 US 347, 355-360 [1976]). The First Amendment to "the Constitution of the United States does not authorize the expenditure of public funds to promote the reelection of the President, Congressmen, and State and local officials (to the exclusion of their opponents), even though the open discussion of political candidates and elections is basic First Amendment material” (Anderson v City of Boston, 376 Mass 178, 380 NE2d 628, 637, n 14 [1978]). Courts and scholars of the First Amendment draw a distinction between governmental speech and the expression of individual views by those who work for or are elected to government. "When considering government speech, it becomes necessary to recognize the difference between advocacy by 'governments’ as institutions, an activity which may call into question the constitutional principles explained here, and advocacy by individual policy makers who not only enjoy constitutional protection to speak but whose position requires them to develop, implement and garner support for their policy choices” (Burt v Blumenauer, 299 Ore 55, 699 P2d 168, 176, n 6 [1985]). Whatever the difficulty in distinguishing government speech from the individual advocacy of an elected government official in other cases (supra, 699 P2d, at 176; Yudof, When Governments Speak: Toward a Theory of Government Expression and the First Amendment, 57 Tex L Rev, at 902-905 [1979]), the wholesale use of the Senate minority staff to conduct political campaigns, from budget preparation and organized fund raising to volunteer coordination, to elect legislative candidates selected by the Senate leadership of the Democratic Party is clearly an ultra vires use of a government institution to advocate partisan political objectives not to be equated with the individual expression of support for candidates by elected officials and members of their staff protected by the First Amendment. (See, Fair Political Practices Commn. v Suitt, 90 Cal App 3d 125, 153 Cal Rptr 311, 314 [1st Dist 1979], supra; Yudof, op. cit, 57 Tex L Rev, at 917-918; Shiffrin, Government Speech, 27 UCLA L Rev 565, 612-613 [1980]; compare, Civil Serv. Commn. v Letter Carriers, 413 US 548, 556 [1973].)

. The court is concerned here only with those staff who performed campaign duties during the 1986 election.

. Legislative declarations of fact aré generally conclusive upon judicial inquiry into matters within the Legislature’s constitutional province. (See, e.g., People ex rel. Kemmler v Durston, 119 NY 569, 578 [1890]; Verry v Trenbeath, 148 NW2d 567, 575 [ND 1967]; compare, Powell v McCormack, 395 US 486, 521, n 42 [1969].) In any event, these declarations are consistent with contemporary accounts of legislative employment practices given by legislative employees who were witnesses before the Grand Jury.

. Examples of such abuse include paying a commission staff member to keep Sanzillo informed on political affairs in Nassau County, paying a commission staff member to write political pamphlets, and paying a special assistant to the minority while attending law school in Washington, D.C.

. In areas within the protection of the Speech or Debate Clause, the presumption is in effect irrebuttable, as legislators are immune from answering to courts even for their patently unconstitutional legislative acts. (Doe v McMillian, 421 US 306, 312-313 [1973]; Eastland v United States Servicemen’s Fund, 421 US 491, 507-511 [1975].) Since the activities of the legislative staff at issue here have been determined to be political, not legislative, acts (United States v Brewster, 408 US 501, 512 [1972]), absolute immunity does not apply. (See, text, supra, at 920-922.)