[828 NYS2d 12]

URBAN JUSTICE CENTER et al., Appellants-Respondents, v
GEORGE E. PATAKI, as Governor of the State of New York,
et al., Respondents-Appellants.

First Department, December 21, 2006

22

## APPEARANCES OF COUNSEL

*Cleary Gottlieb Steen & Hamilton LLP*, New York City (*Evan A. Davis* and *Lisa M. Colone* of counsel), and *Douglas Lasdon*, New York City, for appellants-respondents.

*Eliot Spitzer, Attorney General*, New York City (*Gregory Silbert* and *Michelle Aronowitz* of counsel), for respondents-appellants.

## OPINION OF THE COURT

BUCKLEY, P.J.

Plaintiffs, Urban Justice Center, a public advocacy organization, Thomas J. Kirwan, a Republican member of the Democratic-controlled State Assembly, and Liz Krueger, a Democratic member of the Republican-controlled State Senate, bring this declaratory judgment action to challenge the legality of five practices of the State Legislature, and one of the Governor at the behest of legislative leaders, purportedly used by the majority party in each chamber to deny minority party members meaningful participation in the legislative process.

The complaint asserts that the majority leaders of each house allocate a disproportionately greater amount of funds and resources for "member support" (staff, office space, computers, travel reimbursements, and printing and mailing costs for newsletters) to members of the majority party than to similarly situated members of the minority party, in violation of the Equal Protection clauses of the federal and state constitutions (count I), the free speech, association, and debate provisions of the federal and state constitutions (count II), and the prohibition of article VII, § 8 of the State Constitution against gifts and loans of state funds (count III).

Plaintiffs also contest the unequal funding of "member items" or "local initiatives" of individual members in their home

districts, on the same grounds as the member support claims (counts IV through VI), as well as article VII, § 7 of the State Constitution, which provides that no state funds be spent except in pursuance of an appropriation that distinctly specifies the object or purpose to which the monies shall be applied (count VII).

Next, the complaint alleges that legislative rules create insurmountable obstacles for minority party members to discharge a bill from committee and send it to the full chamber, in contravention of the Equal Protection clauses of the federal and state constitutions (count VIII), and the free speech, association, and debate provisions of the federal and state constitutions (count IX).

Plaintiffs contend that majority party conferences are, in actuality, secret debates and votes, which frustrate the Equal Protection clauses of the federal and state constitutions (count X), the free speech, association, and debate provisions of the federal and state constitutions (count XI), "the implied constitutional right of voters to know how their representatives voted" (count XII), and New York's Open Meetings Law (Public Officers Law art 7) (count XIII).

Plaintiffs also allege that the Governor, at the request of the Majority Leader and Speaker, excessively and improperly issues "messages of necessity," which permit the Legislature to bypass the constitutional requirement of article III, § 14 of the State Constitution that "[n]o bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days prior to its final passage." According to plaintiffs, the improper use of messages of necessity violates the Equal Protection clauses of the federal and state constitutions (count XIV), and the free speech, association, and debate provisions of the federal and state constitutions (count XV). In addition, plaintiffs assert that article III, § 14 of the State Constitution requires that messages of necessity be signed personally by the Governor, rather than by autopen (count XVI).[1]

The final challenged practice is the payment of allowances, pursuant to Legislative Law § 5-a, to legislative members with a "special capacity," such as chair of a committee, which plaintiffs

---

1. Following the issuance of *Maybee v State of New York* (4 NY3d 415 [2005]), plaintiffs withdrew count XVII, which alleged that the Governor cannot utilize boilerplate language to recite the facts justifying an immediate vote.

contend runs afoul of the Equal Protection clauses of the federal and state constitutions (count XVIII), the free speech, association, and debate provisions of the federal and state constitutions (count XIX), and article III, § 6 of the State Constitution, which governs the payment of allowances for a special capacity (count XX).

Standing

▇ Plaintiff Urban Justice Center (UJC) is a nonprofit organization whose mission is to engage in legal advocacy on behalf of the homeless, the indigent, the disenfranchised, and those members of the public who have been deprived of civil and economic rights. UJC's claimed injury, that the challenged practices operate to exclude it and its clients from participating in the legislative process and fulfilling its mission, is too speculative to constitute the type of an injury-in-fact necessary to confer standing (*see Matter of MFY Legal Servs. v Dudley*, 67 NY2d 706, 708 [1986]). There is no allegation that any complained-of practice of the Legislature or the Governor has caused UJC to expend additional resources in performing its mission (*cf. Havens Realty Corp. v Coleman*, 455 US 363, 379 [1982]). UJC has failed to explain how defendants' conduct has prevented it from advocating in the Legislature, with the legislative leaders, or with the legislative members of the majority party, or show that the majority party in either chamber is less favorably disposed toward its mission than the minority party. UJC's allegations are also insufficient to support a finding of representational standing, since the organization does not articulate any direct injury to its clients, other than the injury every citizen allegedly suffers by reason of the challenged practices of the legislative and executive branches of state government (*cf. New York County Lawyers' Assn. v State of New York*, 294 AD2d 69, 75-77 [2002]; *Mixon v Grinker*, 157 AD2d 423 [1990]; *Grant v Cuomo*, 130 AD2d 154, 159 [1987], *affd* 73 NY2d 820 [1988]).

▇ With respect to the legislator plaintiffs, the Court of Appeals has commented: "Cases considering legislator standing generally fall into one of three categories: lost political battles, nullification of votes and usurpation of power. Only circumstances presented by the latter two categories confer legislator standing" (*Silver v Pataki*, 96 NY2d 532, 539 [2001]). The word "generally" denotes that there may be more categories than the three enumerated. Thus, the statement, "[o]nly . . . the latter two categories confer legislator standing," was not meant to foreclose the possibility of any additional category, as defendants

assert, but rather should be understood as merely specifying that, of the three listed categories, only the last two provide standing.

Contrary to defendants' contentions, the fact that a majority in both chambers rejected the legislator plaintiffs' draft complaint does not automatically render the issues "lost political battles," which would deprive the plaintiffs of standing. In *Raines v Byrd* (521 US 811, 820-821, 829 [1997]), relied on by defendants, the United States Supreme Court drew a distinction between the federal legislators before it who lacked standing to contest the constitutionality of the Line Item Veto Act, on which they had been outvoted (a lost political battle), and the Congressman in a prior case, *Powell v McCormack* (395 US 486 [1969]), who was permitted to challenge "his exclusion from the House of Representatives (and his consequent loss of salary)" (521 US at 821), a personal and private deprivation.

The legislator plaintiffs allege specific injuries to themselves adequate to confer standing with respect to the first seven counts of the complaint, the disproportionate allocation of funds for "member support" and "local initiatives" (*see Raines, supra*). As minority party members receiving less funding than similarly situated majority party members for staff, office space, computers, travel reimbursements, printing and mailing costs for newsletters, as well as member-initiated projects in their home districts, plaintiff legislators have alleged a concrete, personal injury.

However, the remaining counts, obstacles to the discharge of bills from committee, secret majority party conferences, the improper use of messages of necessity, and the payment of allowances for special capacities, involve only "a type of institutional injury (the diminution of legislative power)," which does not provide standing (*Raines*, 521 US at 821).

In *Raines*, the plaintiff legislators, who had been in the minority voting against the Line Item Veto Act, argued that the statute would render their votes on future appropriation bills less "effective" than before, thereby changing the "meaning" and "integrity" of their votes (*see id.* at 825). Specifically, they asserted that, prior to the Act, a vote for an appropriation bill was a vote for a package of projects inextricably linked, but after the Act the President could cancel a particular project without vetoing the rest of the bill (*see id.*). The Court characterized that argument as alleging a mere "abstract dilution of institutional legislative power," insufficient to confer standing (*see id.* at

826).[2] Similarly, in *Silver v Pataki* (96 NY2d at 539 n 5), the Court of Appeals ruled that the Speaker's claimed injury to his ability "to negotiate the Assembly's priorities and interests in the budget process" was a political dispute and abstract institutional injury that did not satisfy the standing requirements.

The claims that it is difficult to discharge a bill from committee to the full chamber without the consent of the Majority Leader or Speaker (as the case may be), that majority party legislative conferences meet in secret, that the Majority Leader and Speaker importune the Governor to overuse messages of necessity to force votes before legislators have an adequate opportunity to review and debate proposed bills (which messages of necessity the Governor does not personally sign), and that committee chairs receive higher "special capacity" allowances than ranking minority members (who in turn receive higher payments than the remaining legislators), are all abstract institutional grievances that do not rise to the level of an injury-in-fact.[3]

In *Page v Shelby* (995 F Supp 23 [D DC 1998], *affd without op* 172 F3d 920 [DC Cir 1998]), the court noted that, in light of *Raines* (*supra*), it is doubtful whether United States Senators would have standing to challenge the "cloture rule," requiring 60 Senators to vote to limit the time for debate on a pending matter, since any injury, common to all Senators, would amount to no more than a loss of political power or an abstract dilution of institutional legislative power. Although dictum, the reasoning is sound, and the instant claims of obstacles to the dis-

---

**2.** *Silver v Pataki* (96 NY2d 532 [2001]) is not to the contrary. In that case, the Speaker, who had voted along with a majority of both houses of the Legislature to pass certain "non-appropriation" bills, had standing to contest the constitutionality of the Governor's line-item veto of various provisions in those bills. Thus, the Speaker was not contesting the abstract effect of a line-item veto, but rather argued that, while the Governor was constitutionally authorized to exercise a line-item veto with respect to an "appropriation" bill, he could not do so with respect to a "non-appropriation bill." In addition, actual bills, not theoretical future ones, were at issue. Moreover, the bills had been approved by the Legislature, and thus would have become law in their entirety had the Governor not utilized the line-item veto provisions.

**3.** In *Maybee v State of New York* (4 NY3d 415 [2005]), the Court of Appeals upheld the dismissal of a claim that the Governor cannot use boilerplate language to justify a message of necessity. The issue of standing was not discussed, and in any event, the plaintiff was an individual who claimed that his business was harmed by a specific bill that had been sent to the Legislature with a message of necessity. Here, plaintiffs do not even allege any bill they were prevented from discharging from committee or adequately debating.

charge of bills from committee, secret majority party conferences, the improper use of messages of necessity, and the payment of allowances for special capacities, are akin to a claim against the federal cloture rule.

The twelfth cause of action, that the majority party secret conferences preclude legislators' constituents from knowing what positions the representatives took, should be denied for lack of standing on the additional ground that the legislator plaintiffs may not raise legal grievances on behalf of others (*see Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 773 [1991]).

Separation of Powers and Failure to State a Cause of Action

■ The doctrine of the separation of powers is grounded on the principle that each of the three branches of government, executive, legislative, and judicial, possesses "distinct and independent powers, designed to operate as a check upon those of the other two co-ordinate branches," and each "is confined to its own functions and can neither encroach upon nor be made subordinate to those of another" (*Matter of Davies*, 168 NY 89, 101, 102 [1901]). Thus, "each department should be free from interference, in the discharge of its own functions and peculiar duties, by either of the others" (*Matter of Gottlieb v Duryea*, 38 AD2d 634, 635 [1971], *affd* 30 NY2d 807 [1972], *cert denied* 409 US 1008 [1972]), since " '[i]t is not merely for convenience in the transaction of business that they are kept separate by the Constitution, but for the preservation of liberty itself' " (*New York State Bankers Assn. v Wetzler*, 81 NY2d 98, 105 [1993], quoting *People ex rel. Burby v Howland*, 155 NY 270, 282 [1898]). For those reasons, " 'it is not the province of the courts to direct the legislature how to do its work' " (*New York Pub. Interest Research Group v Steingut*, 40 NY2d 250, 257 [1976], quoting *People ex rel. Hatch v Reardon*, 184 NY 431, 442 [1906]), particularly when the internal practices of the Legislature are involved (*see Matter of Gottlieb*, 38 AD2d at 635). Thus, taking cognizance of the separation of powers doctrine, the courts have refused to intrude upon such "wholly internal affairs of the Legislature" as the propriety of a roll call vote in the Senate (*see Heimbach v State of New York*, 59 NY2d 891 [1983], *appeal dismissed* 464 US 956 [1983]), the permissible scope of duties performed by legislative employees (*see People v Ohrenstein*, 153 AD2d 342 [1989], *affd on other grounds* 77 NY2d 38 [1990]), the accuracy of Senate Journal entries (*Matter of Ohrenstein v Thompson*, 82 AD2d 670 [1981], *appeal dismissed* 56 NY2d 644

[1982]), and the propriety of the Assembly Speaker's refusal to permit the use of state funds to mail an Assemblyman's letter to his constituents deemed "too political" (*see Matter of Gottlieb*, 38 AD2d at 634; *see also Nixon v United States*, 506 US 224 [1993] [procedures for impeachment proceedings in the United States Senate are not justiciable]).

The first three causes of action, contesting the unequal provision of office space, equipment, staff, and printing and mailing expenses, essentially challenge the Legislature's allocation of institutional resources to its own members, a classic example of internal administrative prerogatives that are properly left to the Legislature to make, in furtherance of the duties particular to that body, without interference from the other two branches of government. It is not for the courts to review who gets which office or what model computer, which letters should be printed and mailed, or other such matters. Plaintiffs do not claim that they are denied member support, only that they receive less than majority members. However, as the complaint itself reveals, a legislator's official governmental duties and political activities overlap:

> "Although [the distinction between governmental and political activities] may be relevant to other State employees, the line between political and governmental activities is not so easily drawn in cases dealing with legislators . . .

> "The Legislature is the 'political' branch of government. All of its members are elected every two years and all legislation is the product of political activity both inside and outside the Legislature. Indeed, by statute the State Legislature itself is structured along party lines with the majority and minority parties in both houses organized behind elected party leaders . . . In addition to political activities formally recognized at law, there are additional functions which a legislator performs to gain support in the community, such as distributing newsletters and meeting constituents. Although these activities may be fairly characterized as political, as opposed to governmental, they are considered an inherent part of the job of an elected representative . . . ." (*Ohrenstein*, 77 NY2d at 47.)

This Court, in that same case, elaborated:

> "the ability to effectively accomplish particular

legislative goals is in great measure predicated upon . . . partisan party affiliations. Enactment of legislation cannot be separated from political involvement and, realistically, political party platforms are the basis for legislation under our system of government. The wide range of activities performed outside the purely legislative sphere which have grown over the years in part because they are a means of developing continuing support for future elections have been held to be entirely legitimate activities. It can be argued that politics historically has been an integral part of the legislative process and is intimately related to, and intertwined with, the legislator's public role in attempting to garner public support for the legislative programs which he or she espouses" (*Ohrenstein*, 153 AD2d at 366-367 [citation omitted]).

In discussing how the leaders in the Legislature are the coordinators of the parties' political and legislative strategy, Supreme Court in *Ohrenstein*, quoted by the Appellate Division, stated:

" 'It is a basic tenet of our system of government that legislation and legislators should reflect the popular will, which is primarily manifested through the competitive political process. Therefore, the line between partisan political action and constituent representation is and should be elastic, and is not subject to judicial or executive fiat. Whether and to what extent the process of forging a popular consensus in support of a legislative agency may be distinguished from the promotion of a party's or an individual's political aspirations is a difficult issue, requiring factual determinations and policy decisions that are beyond the competence of courts to decide within the limits of a particular controversy' " (*id.* at 368-369, quoting 139 Misc 2d 909, 943-944 [1988]).

With those precepts in mind, to the extent the first three causes of action complain that plaintiffs' political effectiveness is impaired, the argument is too intertwined with internal legislative affairs to be susceptible of judicial review. In addition, the lack of judicially discernible and manageable standards for assessing how much political activity should be permitted the legislators in representing their constituents and attempt-

ing to enact legislation renders the matter nonjusticiable, even though "some intent to gain political advantage is inescapable" (*see Vieth v Jubelirer*, 541 US 267, 298 [2004] [political gerrymandering claims nonjusticiable for lack of judicially discernible and manageable standards]).

For the same reasons, the claims regarding local initiatives, the discharge of bills from committee, the holding of majority party conferences, and the payment of special capacity allowances, are internal matters for the Legislature, not the courts.

Specifically, funding for local initiatives entails the allocation of legislative resources for legislative policy purposes, and any collateral political effect does not justify judicial interference. Moreover, there are no workable judicial standards of review to judge the propriety of such allocations (*see Ohrenstein, supra*; *Vieth, supra*). Of course, each member could be given an equal amount of funding for local initiatives, but that would require a policy determination ignoring the circumstances and needs of different legislative districts, and thus cannot be imposed by judicial fiat. In addition, the claim asserted in count VII, that funding for local initiatives is improperly appropriated in lump sums, rather than distinctly specified amounts, is essentially an argument that the budget is insufficiently itemized, which is nonjusticiable. It is not "a proper function of the courts to police the degree of itemization necessary in the State budget," a task for which the courts "are neither constituted, suited, nor, indeed, designed," but rather "is a decision which is best left to the Legislature" (*Saxton v Casey*, 44 NY2d 545, 549, 550 [1978]). Even if a Legislature should "fail in its responsibility to require a sufficiently itemized budget, the remedy lies not in the courtroom, but in the voting booth" (*id.* at 551).

The manner in which bills are voted out of committee is determined by entirely internal rules of proceedings, which article III, § 9 of the Constitution vests in each house of the Legislature (*see Heimbach, supra*). Similarly, article III, § 6 of the Constitution entrusts to the Legislature the decisions as to which offices should receive special allowances and the amounts thereof (*see Steingut*, 40 NY2d at 260). Notably in contrast to the directive that "[e]ach member of the legislature . . . receive . . . a like annual salary" contained in that same constitutional section, "[a]ny member, while serving as an officer of his or her house or in any other special capacity therein or directly connected therewith . . . , may also be paid and receive . . . any allowance which may be fixed by law for the particular and ad-

ditional services appertaining to or entailed by such office or special capacity" (NY Const, art III, § 6). Moreover, the section states that: "The provisions of this section and laws enacted in compliance therewith shall govern and be exclusively controlling, according to their terms" (*id.*).

The challenges to the holding of majority political party conferences are nothing less than an assault upon our party system of government, in which all the parties, not only the majority, try to coordinate political and legislative strategy, with greater or lesser effectiveness. While the Open Meetings Law (Public Officers Law art 7) does mandate that "[e]very meeting of a public body shall be open to the general public" (Public Officers Law § 103 [a]), Public Officers Law § 108 (2) (a) expressly exempts "deliberations of political committees, conferences and caucuses." Section 108 (2) (b) elaborates:

> "for purposes of this section, the deliberations of political committees, conferences and caucuses means a private meeting of members of the senate or assembly of the state of New York . . . who are members or adherents of the same political party, without regard to (i) the subject matter under discussion, including discussions of public business, (ii) the majority or minority status of such political committees, conferences and caucuses or (iii) whether such political committees, conferences and caucuses invite staff or guests to participate in their deliberations."

That exception was added in 1985, upon a legislative declaration:

> "that the public interest is well served by the political party system in legislative bodies because such parties serve as mediating institutions between disparate interest groups and government and promote continuity, stability and orderliness in government. The performance of this function requires the private, candid exchange of ideas and points of view among members of each political party concerning the public business to come before legislative bodies. Recent judicial decisions have, however, eroded this exemption by holding that it applied only to discussions of political business" (L 1985, ch 136, § 1).

Those legislative pronouncements reflect the notion that politi-

cal parties are legitimate vehicles for governmental involvement and that the claims are not justiciable (*see Vieth, supra*). In light of the explicit statutory exception, the party conference claims should be dismissed on the additional ground that they fail to state a cause of action. Moreover, by requesting that only the majority party be precluded from holding closed conferences, plaintiffs effectively seek their own political advantage, in that minority parties would be unhindered from conducting secret convocations. In *Matter of Humphrey v Posluszny* (175 AD2d 587 [1991], *appeal dismissed* 78 NY2d 1072 [1991]), relied on by plaintiffs, a specific meeting, held on a particular date, was found to have violated the Open Meetings Law, in contrast to the instant action, where plaintiffs challenge political conferences, in toto; therefore, we find it unnecessary to reach the issue whether we would follow the Fourth Department's decision in that case.

The doctrine of the separation of powers forecloses judicial review of the claims concerning the Governor's alleged overuse of messages of necessity. In *Maybee* (4 NY3d 415 [2005]), the Court of Appeals held that the sufficiency of the facts stated in a message of necessity is not open to judicial review, but rather is committed by article III, § 14 of the Constitution to the Governor alone to determine, particularly since the Legislature has its own remedy of not acting on a bill if it deems the Governor's reasons for the message of necessity inadequate. The same analysis applies to when or how often the Governor issues messages of necessity. Indeed, in *Maybee* the Court stated, "[t]he Governor is far better equipped than the courts to assess the need for speedy passage of a bill" (*id.* at 420).

Plaintiffs also argue that the constitutional provision requiring the Governor to "have certified, under his or her hand and the seal of the state," the facts warranting a message of necessity (NY Const, art III, § 14), mandates that the Governor physically sign such messages and precludes the use of an autopen signature. Supreme Court should have dismissed that claim for failure to state a cause of action, since the signing of a message of necessity by autopen substantially complies with the letter and spirit of the constitutional requirement (*Matter of Schneider v Rockefeller*, 31 NY2d 420, 434 [1972]). Plaintiffs' assertion that the "by hand" provision is a substantive requirement that "makes it more likely the Governor will have read and considered these extraordinary requests" is dubious at best. Should the future bring a Governor who does not concern himself with the contents of his own proposals, the prohibition

of autopen signatures will do little to alleviate the problem, and a more drastic remedy would be necessary.

Defendants' arguments concerning legislative immunity under the Speech or Debate Clause of the State Constitution (art III, § 11) overlap, to a great extent, with their political doctrine assertions, and we therefore decline to reach those issues or the scope of the immunity.

Accordingly, the order of the Supreme Court, New York County (Jane S. Solomon, J.), entered November 22, 2005, which granted defendants' CPLR 3211 motion to the extent of directing that 17 of plaintiffs' 20 causes of action be dismissed, should be modified, on the law, to dismiss the remaining causes of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.

SAXE, FRIEDMAN, WILLIAMS and MALONE, JJ., concur.

Order, Supreme Court, New York County, entered November 22, 2005, modified, on the law, to dismiss the remaining causes of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint.