OPINION OF THE COURT
Mary Ann Brigantti-Hughes, J.
Plaintiffs, Mary McKinney and Mechler Hall Community Services, Inc. moved by order to show cause for a temporary restraining order (TRO) enjoining the defendants, the Commissioner of the New York State Department of Health, the New York State Department of Health (NYSDH) and the State of New York from implementing the recommendations of the Commission on Health Care Facilities in the 21st Century to close the Westchester Square Medical Center (WSMC), located at 2475 St. Raymond Avenue, in Bronx county, and other similarly *745 situated medical facilities. Defendants cross-moved for an order pursuant to CPLR 3211 (a) for summary judgment dismissing plaintiffs’ complaint for failure to state a cause of action, lack of standing and failure to join a necessary party.
On January 3, 2007, this court heard oral argument on the TRO proposed by the plaintiffs. After hearing the arguments, the court granted the TRO only as it applied to WSMC and did not rule on the various underlying issues raised. The court afforded all of the parties an opportunity to submit answering and/or reply papers and memorandum of law no later than January 29, 2007.
The Commission, also known as the Berger Commission, was specially created by the New York State Legislature as the result of its recognition that the possible existence of excess hospital capacity would threaten both the stability and efficiency of New York State’s health care system. The Commission was empowered by the Legislature to conduct “a rational, independent review of health care capacity and resources in the state . . . [and was] . . . charged with examining the supply of general hospital and nursing home facilities, and recommending changes that will result in a more coherent, streamlined health care system in the state of New York.” {See L 2005, ch 63, part E, § 31, adding part K [Enabling Legislation], § 1 [establishing a Commission on Health Care Facilities in the 21st Century].)
The Enabling Legislation provides that the Commission shall consist of 18 statewide members and up to 36 regional members who are appointed by the Governor and the Legislature. {See Enabling Legislation §§ 2, 7.)
The regional members are selected from six regions: New York City, Long Island, Hudson Valley, and Northern, Central and Western New York, thus creating six “Regional Advisory Committees” (RACs). Regional members were authorized to vote only on those recommendations related to their respective regions. {See Enabling Legislation § 7.)
Additionally, RACs were required to “develop recommendations for reconfiguring its region’s general hospital and nursing home supply to align bed supply with regional and local needs.” (Enabling Legislation § 7 [d].) Each RAC was required to transmit its individual report to the Commission on November 15, 2006. {See Enabling Legislation § 7 [c], [d].)
Thereafter, the Commission was required to “develop recommendations for reconfiguring the state’s general hospital and nursing home bed supply to align bed supply to regional needs *746 [and to] . . . make recommendations relating to facilities to be closed and facilities to be resized, consolidated, converted or restructured” in each of the six regions of the state. (Enabling Legislation § 8 [a], [b].) In carrying out its functions, the Commission was required to collaborate with the RACs to foster discussion and obtain community input and to take into consideration the recommendations of the RACs. In addition, the Commission was required to transmit its final report to the Governor on or before December 1, 2006. (See Enabling Legislation § 8.)
Section 9 of the Enabling Legislation states that, unless the Governor failed to transmit the final report by December 5, 2006 or a majority of the members of each house of the New York State Legislature voted to adopt a concurrent resolution rejecting the Commission’s recommendations in its entirety by December 31, 2006, the Commissioner of Health “shall take all actions necessary to implement, in a reasonable, cost-efficient manner, the recommendations of the commission.” (Enabling Legislation § 9 [a], [b].)
The Enabling Legislation established the following nine factors to be considered as part of the analytic methodology: the need for capacity in each of the hospital and nursing homes systems; current capacity in each system; the economic impact of right sizing actions; the amount of capital debt; the availability of alternative sources of funding; the existence of other health care services; the potential conversion of facilities for alternate uses; the extent to which a facility serves the need of the region and vulnerable populations; and the potential for improved quality of care. (See Enabling Legislation § 5.)
The Commission consolidated the factors into the following six key criteria: service to vulnerable populations, availability of services, quality of care, utilization, viability, and economic impact. Nineteen public hearings were conducted by the Commission or its RACs to gather information and community input throughout the state. Five such hearings were held in New York City, one in each borough. (See Final Report of Commn on Health Care Facilities in 21st Century, A Plan to Stabilize and Strengthen New York’s Health Care System [Final Report] at 68-70, <http://www.nyhealthcarecommission.org/docs/final/ commissionfinalreport.pdf> [Dec. 2006], cached at <http:// www.courts.state.ny.us/reporter/webdocs/commissionfinalreport.pdfx)
The Commission’s Final Report, entitled “A Plan to Stabilize and Strengthen New York’s Health Care System” contained *747 recommendations for the closing, downsizing or reconfiguration of a total of 57 acute health care facilities throughout New York State. Its effects reach approximately one quarter of all the hospital space in this state. With respect to WSMC, the Commission made the following observations: WSMC only provides general adult medical/surgical care and no specialty medical care. WSMC provides no maternity care, psychiatric service or substance abuse care. WSMC operates at a near-break-even operating margin. Despite its location in a federally designated medically underserved area, WSMC’s payor mix includes few Medicaid-covered and uninsured patients. In 2004, 12% of the hospital patients were either Medicaid or uninsured clients. In 2004, WSMC records indicate that its bed occupancy rate was a mere 51%. WSMC functions largely as a feeder to tertiary hospitals in the New York Presbyterian Health System (NYPHS). A review of the medical facilities available to patients in the same area shows that WSMC patients could be absorbed by surrounding medical facilities such as St. Barnabas Hospital, Montefiore/Weiler Campus and Moses Campus, Jacobi Hospital, Our Lady of Mercy Hospital, and other medical facilities belonging to the NYPHS. (See Final Report at 159-160.)
As a consequence, the Final Report of the Commission indicated that WSMC represented excess capacity in the health care system and recommended that it be closed. (See Final Report at 159.) The Final Report also stated, “Unless otherwise specified, the Commissioner of Health shall implement each recommendation as expeditiously as possible, but in no event later than June 30, 2008.” (See Final Report at 90.)
The Fined Report was transmitted in a timely fashion to the Governor and the Legislature on November 28, 2006. (See Enabling Legislation § 8; Final Report.) The Governor subsequently transmitted the Final Report, with his approval thereof, to the Legislature on November 30, 2006. The Legislature did not pass a concurrent resolution rejecting the Final Report prior to the end of 2006. As such, the Commissioner of Health is mandated by the Enabling Legislation to implement the Commission’s recommendations. (See Enabling Legislation § 9.)
Joinder
WSMC, the subject medical facility, was not joined in this action and has specifically declined being a party to this ac *748 tion.[1] Defendants argue that this action must be dismissed because WSMC may suffer prejudice if it is bound by this court’s determination. In support of its argument, defendants cite CPLR 1001 (a) and its purposes: it “prevents multiple, inconsistent judgments” and “protects the otherwise absent parties who . . . have had no opportunity to be heard.” (Saratoga County Chamber of Commerce v Pataki, 100 NY2d 801, 820 [2003] [internal quotation marks omitted].)
Plaintiffs argue that WSMC is not a necessary party to the action because WSMC chose not to intervene (see id.); WSMC would raise distinct issues; WSMC is not a necessary party to reach the constitutionality issue and it has not been shown how WSMC would be prejudiced. (International Assn. of Machinists & Aerospace Workers v Allegis Corp., 144 Misc 2d 983 [Sup Ct, NY County 1989]; Phillips v Town of Stony Point, 104 AD2d 1033 [2d Dept 1984].)
The courts are afforded wide latitude in determining whether there is a nonjoinder pursuant to CPLR 1001 (a), which should be liberally construed. (Micucci v Franklin Gen. Hosp., 136 AD2d 528 [2d Dept 1988]; Gross v BFH Co., 151 AD2d 452 [2d Dept 1989].) To the extent WSMC may claim that the Enabling Legislation is unconstitutional, WSMC’s and plaintiffs interests are intertwined and coincide. (Matter of 27th St. Block Assn. v Dormitory Auth. of State of N.Y., 302 AD2d 155 [1st Dept 2002]; Matter of Long Is. Contractors’ Assn. v Town of Riverhead, 17 AD3d 590 [2d Dept 2005].) In addition, WSMC, “obviously aware of the proceeding, could have avoided any prejudice by seeking intervention.” (27th St. Block Assn, at 163.) Furthermore, as plaintiffs’ only cause of action involves an issue of law, to wit, the constitutionality of the Enabling Legislation, it is the opinion of this court that WSMC is not a necessary party to the instant action. (Kronish Lieb Weiner & Heilman LLP v Tahari, Ltd., 35 AD3d 317 [1st Dept 2006].)
Standing
As it is alleged that it will take billions of dollars to effectuate the Commission’s report, plaintiffs assert their standing to bring *749 the petition and. present motion based on the right of a taxpayer to maintain an action for relief for an allegedly unconstitutional disbursement of state funds (see State Finance Law, art 7-A, § 123-b et seq.; Stanton v Board of Supervisors of County of Escsex, 191 NY 428 [1908]), as well as from the common law. (See Doe v Axelrod, 136 AD2d 410 [1st Dept 1988], mod on other grounds 73 NY2d 748 [1988]; Community Serv. Socy. v Cuomo, 167 AD2d 168 [1st Dept 1990] [where the courts have found that the proposed regulations affected the rights of plaintiff in the action].)
Plaintiff McKinney bases her common-law standing on her long-time relationship with WSMC. She argues that the closure of WSMC will significantly disrupt her health care. For example, McKinney faces the possible loss of her relationship with her physicians who are affiliated with WSMC and may have to relocate due to its closing. In addition, McKinney alleges that the increased travel time to another hospital for an emergency room visit will impose significant burdens on her access to necessary health care. In support of this contention, she presents her own affidavit, affidavits from a doctor and several of the nursing staff of WSMC stating their concerns for the health of their patients and the good of the community, and affidavits provided by administrators from several local centers and senior facilities indicating that many of their clients prefer to stay in the community atmosphere of WSMC.
Plaintiff Mechler Hall is a not-for-profit corporation that services the senior citizens in the Parkchester area of the Bronx. Like McKinney, many of the 65 to 80 members of Mechler rely on WSMC for their health care. Mechler has also provided an affidavit, from its executive director, which introduced two of its members who would be negatively affected by WSMC’s closing.
In opposition, defendants argue that plaintiffs lack common-law standing because plaintiffs do not have an actual legal stake in operating certificates, do not have a legal right to medical care at WSMC, and do not have an in-fact injury within the zone of interests. (Society of Plastics Indus, v County of Suffolk, 77 NY2d 761 [1991].) Defendants further allege that plaintiffs’ allegation that the state funds will not be spent wisely does not have a sufficient nexus to fiscal activities of the State and is insufficient to confer standing. (Rudder v Pataki, 93 NY2d 273 [1999]; Saratoga County Chamber of Commerce at 813-814 [“a claim that state funds are not being spent wisely is patently insufficient to satisfy the minimum threshold for standing, but *750 a claim that it is illegal to spend money at all for the questioned activity likely would provide the plaintiff with standing”].)
Taxpayer Standing
Plaintiffs do not have taxpayer standing as its cause of action is a constitutional challenge of the Enabling Legislation. Although state funds are going to be expended in implementing the Final Report, the purpose of the Enabling Legislation is not the expenditure of state funds. Thus, plaintiffs attempt to obtain judicial scrutiny over the State’s nonfiscal activity. (See Rudder at 281.) In Rudder, the Court of Appeals stated:
“Since most activities can be viewed as having some relationship to expenditures, . . . too broad a reading of section 123-b would create standing for any citizen who had the desire to challenge virtually all governmental acts. The claims here regarding [defendant’s] nonfiscal rule-making review function do not demonstrate a sufficient nexus to fiscal activities of the State to allow for section 123-b standing.” (Id.)
Thus, it is the opinion of this court that plaintiffs do not have taxpayer standing to challenge the Enabling Legislation.
Common-Law Standing
It is well settled that a party does not have standing to contest an administrative determination unless the party has an injury-in-fact or actual stake in the matter, the injury falls within the zone of interests sought to be protected by the statute, and the injury is different from that suffered by the public at large. (See Society of Plastics at 773-774.) These same principles of standing apply whether the party seeking relief is one person or an association of persons. (Id. at 775.) In addition to the above principles, in order to establish organizational standing, a plaintiff must demonstrate that at least one of its members would have standing to sue; that the interests it asserts are germane to its purposes so as to satisfy the court that it is an appropriate representative of those interests; and that the case would not require the participation of its individual members. (Id.) The requirement that a petitioner’s injury fall within the concerns the Legislature sought to advance or protect by the statute assures that groups whose interests are only marginally related to, or even inconsistent with, the purposes of the statute cannot use the courts to further their own purposes at the expense of the statutory purpose. (Id. at 774.)
*751 In the instant case, plaintiffs do not have a legal stake or right to the operating licenses. In addition, the injury suffered by plaintiffs, i.e., that access to health care might be disrupted, is speculative and no different from the injury that the public might experience. (Matter of Rent Stabilization Assn. of N.Y.C., Inc. v Miller, 15 AD3d 194 [1st Dept 2005]; Urban Justice Ctr. v Pataki, 38 AD3d 20 [1st Dept 2006].) Furthermore, the purpose of the Enabling Legislation to “streamline”[2] the health care system and make it more efficient by closing or downsizing hospitals and nursing homes reflects the policy decision of the Legislature. As such, plaintiffs’ injury does not fall within the zone of interests sought to b§ protected by the Enabling Legislation.
However, it is significant to note that the Court of Appeals and Appellate Division, Third Department, have given a more liberal construction to standing. “[T]he increasing pervasiveness of administrative influence on daily life . . . necessitates a concomitant broadening of the category of persons entitled to a judicial determination of administrative actions.” (Matter of New York State Socy. of Surgeons v Axelrod, 157 AD2d 54, 56 [3d Dept 1990] [internal quotation marks omitted], quoting Matter of Dairylea Coop. v Walkley, 38 NY2d 6, 10 [1975].)
A fundamental tenet of our judicial system is when a government agency seeks to act in a manner adversely affecting a party, judicial review of that action may be had. (Matter of Dairylea Coop. at 10.) As opposed to the zone of interest test applied in Society of Plastics {supra), the right to challenge administrative action has been enlarged by the courts. (Id.) As such, a broader interpretation of the principle of legal standing requires that standing be conferred to a party adversely affected by a decision or regulation of an administrative agency.
Therefore, it is the opinion of this court that the constitutional issue presented herein necessitates a ruling on the merits.
Plaintiffs’ Cause of Action
The plaintiffs challenge the constitutionality of the Enabling Legislation which delegates to a nonelected public commission the power to redirect the critical health care resources of the State of New York. In their verified complaint, plaintiffs seek (1) a declaration that the Enabling Legislation was an unconsti *752 tutional delegation of legislative power and violated the Constitution’s separation of powers doctrine; and (2) an injunction enjoining the Commissioner of Health from implementing the Commission’s recommendations. In their order to show cause, plaintiffs essentially present three arguments to support their claim that the legislation is unconstitutional. First, the legislation is unconstitutional because it authorizes the Commission the ability to make policy decisions that are the constitutional responsibility of the Legislature. Second, the legislation fails to provide meaningful standards to govern the Commission’s authority. Third, the legislation impermissibly grants the Commission the ability to nullify existing laws. As such, plaintiffs argue that the Enabling Legislation is in violation of article III, section 1 of the New York State Constitution, which mandates that the legislative power of the State shall be vested in the Senate and the Assembly. Implicit in the Constitution is the nondelegation principle. Thus, plaintiffs argue that the Enabling Legislation violates the nondelegation principle.
In support of its position, plaintiffs provide affidavits from WSMC’s district State Senator and Assemblyman averring that the Legislature had no opportunity to accept or reject the recommendations of the Final Report. Also, plaintiffs cite various decisions of the Court of Appeals, and other appellate courts, interpreting this constitutional mandate. (See Boreali v Axelrod, 71 NY2d 1 [1987]; Matter of Medical Socy. of State of NY. v Serio, 100 NY2d 854 [2003].)
In opposition, it is significant to note that the defendants cite to many of the same appellate decisions relied upon by plaintiffs to support their position that the Enabling Legislation suffers from no defect or infirmity of constitutional law. (E.g., Boreali-, Medical Socy.) Defendants argue that the Enabling Legislation’s nine enumerated factors provided the Commission with detailed guidance and clear vision as to the policy considerations to be observed by the Commission. Defendants also note the efforts built into the legislation to guarantee that all regions of the state were fairly represented and their interests protected. Thus, defendants argue that the Enabling Legislation does not violate either this State’s Constitution or its separation of powers doctrine. (See also, Clark v Cuomo, 66 NY2d 185 [1985]; Saratoga County Chamber of Commerce, supra; Boreali, supra.)
Delegation of Policy Decisions
The constitutional principle of separation of powers requires that the legislative branch make the critical policy decisions, *753 while the executive branch implements those policies. (Matter of New York State Health Facilities Assn. v Axelrod, 77 NY2d 340 [1991].) That the Legislature cannot delegate all of its lawmaking power to an administrative agency is a principle firmly rooted in the system of government (Matter of Nicholas v Kahn, 47 NY2d 24 [1979]), but it is applied with the “utmost reluctance.” (Boreali at 9.) In addition, the separation of powers doctrine does not divide the branches into watertight compartments, and the lines of demarcation for the legislative and executive branches cannot be easily drawn. (Bourquin v Cuomo, 85 NY2d 781, 784 [1995].) The courts have recognized the necessity of some overlap among the branches of government as well as the great flexibility to be accorded the administrative official in determining the methods for achieving the legislative mandates. (Id. at 785.) The administrative official is accorded flexibility in determining the proper methods to achieve the legislative mandates and the degree of flexibility varies according to the nature of the problem sought to be remedied by the Legislature. (Matter of Broidrick v Lindsay, 39 NY2d 641 [1976].) “Where it is impracticable for the legislative body to fix specific standards . . . broad flexibility in determining the proper methods” will be sustained. (Id. at 646.)
In addition, the courts have acknowledged that there need not be a specific and detailed legislative expression authorizing a particular administrative act as long as the basic policy decision has been made and articulated by the Legislature. (Bourquin at 785.) Indeed, the difficulty and complexity of most of the policy determinations mandate that the legislative body be permitted to provide for the implementation of basic policy through the use of specialized agencies concentrating upon one particular problem at a time. (Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 411 [1991]; Nicholas at 31.) Thus, it is not necessary that the Legislature supply administrative officials with rigid formulas in areas where there are infinitely variable conditions thereby necessitating flexibility. (Id.) Rather, the standards prescribed by the Legislature are to be read in light of the conditions in which they are to be applied. (Id.)
As such, delegation to an administrative agency, panel or committee of the power to make regulations or fill in the details regarding the Legislature’s policy does not violate the separation of powers doctrine. The Court of Appeals in Dorst v Pataki (90 NY2d 696 [1997]) stated:
*754 “We previously have recognized that executive or administrative rulemaking may entail some policy selectivity without offending separation of powers doctrine, so long as the basic policy choices have been made and articulated by the Legislature (ee, Bourquin v Cuomo, 85 NY2d 781, 785). The Legislature is free to announce its policy in general terms and authorize administrators ‘to fill in details and interstices and to make subsidiary policy choices consistent with the enabling legislation’ (Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398, 410, rearg denied 79 NY2d 851).” (Dorst at 699.)
“The cornerstone of administrative law is derived from the principle that the Legislature may declare its will, and after fixing a primary standard, endow administrative agencies with the power to fill in the interstices in the legislative product by prescribing rules and regulations consistent with the enabling legislation.” (Nicholas at 31.)
More and more must the laws become general in form, leaving to commissions, boards or other administrative bodies the establishment of rules and regulations and the determination of the facts to which the general law will apply. (Darweger v Staats, 267 NY 290 [1935].)
The parties are in agreement that the Legislature has authority to delegate some of its policy-making powers to the administrative official. To the extent that plaintiffs argue that the Legislature could not delegate to the Commission the decision concerning which hospitals and nursing homes to be closed or downsized, this court finds no merit to that argument. The Legislature has enacted broad statutes in many instances, leaving to the administrative official the duty to arrange the details. (Matter of Levine v Whalen, 39 NY2d 510 [1976].) It is not always necessary that legislation prescribe a specific action, and, where it is difficult or impractical for the Legislature to lay down a definite and comprehensive rule, a reasonable amount of discretion may be delegated to the administrative official. (Levine at 516.) Because of the complexity and difficulty of the issues involved with streamlining a health care system, the court finds no constitutional violation of the Legislature’s deference to a commission with specialized knowledge (Citizens For An Orderly Energy Policy at 411; Rent Stabilization Assn. of N.Y. City v Higgins, 83 NY2d 156 [1993]), so long as the requisite guidelines are established.
*755 Sufficiency of Guidelines
The Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise. (Levine at 515.) This does not mean that a precise or specific formula must be furnished. (Id.) The standards or guidelines need only be prescribed in so detailed a fashion as is reasonably practicable in light of the complexities of the particular area to be regulated. (Id.)
An administrative agency cannot effect its own policy choices but may only adopt rules and regulations that are consistent with the statutory purpose. (New York State Health Facilities Assn. at 346.) The Court of Appeals stated in New York State Health Facilities Assn.:
“Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. In discharging responsibilities, an agency is ‘clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication .... Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme’ .... It is correspondingly axiomatic, however, that an administrative officer has no power to declare through administrative fiat that which was never contemplated or delegated by the Legislature. An agency cannot by its regulations effect its vision of societal policy choices . . . and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer.” (Id., quoting Matter of Campagna v Shaffer, 73 NY2d 237, 242-243 [1989].)
Thus, it is only when the administrative acts are inconsistent with the Legislature or usurp legislative prerogatives that the doctrine of separation of powers is violated. (Bourquin at 785.)
The Court of Appeals case, Boreali, is instructive. There, the Court indicated that there were several “coalescing circumstances,” any of which, standing alone, is insufficient to warrant the conclusion that the separation of powers doctrine was violated, but, when viewed together, paint a portrait of an agency that improperly assumed for itself open-ended discretion *756 to choose its ends. (Boreali at 11.) The factors include whether the agency had to balance competing concerns of public health and economic costs, whether the Legislature provided guidelines, whether there was special expertise or technical competence utilized, and whether there was legislative inaction. (Id. at 13.)
Applying these circumstances to the case at bar, it is evident that guidelines and specialized expertise were utilized. Although plaintiffs argue that the guidelines were insufficient, the court finds the guidelines sufficient, and in any event finds that general guidelines were necessary due to the complexity of the matter and the Commission should have been afforded great flexibility.
The courts are hesitant to apply persuasive significance to legislative inaction. (Boreali at 14; Bourquin at 787-788 [“Legislative inaction . . . ‘affords the most dubious foundation for drawing positive inferences’ ”]; Clark at 190-191; see also New York State Health Facilities Assn. at 348 [“we ascribe no particular significance to the legislative inaction in this case”].)
Thus, the failure of the Legislature to reach an agreement is not an indication or “indirect proof’ that the Legislature disapproved of such legislation but evinces a legislative preference to yield to administrative expertise. (Medical Socy. at 866.)
When considered in light of the purpose of the Enabling Legislation and the guidelines provided thereto, the balancing of competing social and economic interests by the Commission, in and of itself, is not a violation of the doctrine of the separation of powers. As a matter of fact, “many regulatory decisions involve weighing economic and social concerns against the specific values that the regulatory agency is mandated to promote.” (Boreali at 12.) Unlike Boreali, where the Commissioner was not mandated to utilize a cost-benefit approach, the Legislature, in the case at bar, did authorize the Commission to utilize an economic/cost-benefit analysis. Contrary to plaintiffs’ argument, Boreali does not require that the Legislature promulgate specific guidelines as to how competing interests and costs are to be weighed; it merely finds that a commission must be authorized by the Legislature to utilize a cost-benefit analysis before it can do so.
Furthermore, the cases cited by plaintiff are inapplicable as they were situations where the regulation was not contemplated or delegated by the Legislature, was arbitrary, unreasonable, or *757 inconsistent with legislative policy, or usurped legislative prerogative.
In addition, plaintiffs have not claimed that the proposed regulations in the Final Report are unreasonable, arbitrary or capricious. Nor have they claimed that the Final Report is inconsistent with the Legislature’s policy. (Dorst at 699.) An administrative regulation, legislative in character, will be upheld as valid if it has a rational basis, that is, if it is not unreasonable, arbitrary or capricious. (Levine at 518.)
Finally, that part of the Enabling Legislation that authorizes the Commission to look at additional factors implies that the factors must be consistent with the legislative policy. To the extent that the factors considered by the Commission were consistent with the legislative policy, there is no separation of powers violation.
In the instant case, the Legislature has articulated a social policy and purpose of streamlining the health care system and reducing excess capacity by downsizing or closing hospitals and nursing homes. The Enabling Legislation enumerated criteria that were to be used by the Commission in arriving at its recommendations. Given the complexity of the task involved, the Commission is accorded great flexibility in resolving the issues presented. Thus, the Legislature need not promulgate a specific law indicating which hospitals or nursing homes are to be affected. Furthermore, the Commission’s recommendations are consistent with the intent of the Enabling Legislation. In the present matter, the court finds that the language of the Enabling Legislation plainly sets forth the Legislature’s intent for its passage, creation of the Commission, and sufficiently clear guidelines for the Commission to follow. In Medical Socy., the Court of Appeals stated (at 865): “the Superintendent did not promulgate regulations on a blank slate without any legislative guidance, nor did the revised regulations effectuate a profound change in social and economic policy.” With such a fixed policy intent and structural form firmly in place, the court finds little merit to plaintiffs’ position that said Enabling Legislation constituted a violation of the separation of powers doctrine.
Authority to Nullify Existing Laws
The court finds plaintiffs’ argument that the Commissioner has the authority to nullify existing laws in implementing the Commission’s recommendations unavailing. In phrasing the En *758 abling Legislation with the “notwithstanding” language, the Legislature essentially intended to affect, nullify, or amend some of the existing general laws only to the extent that they contradicted the findings and regulations stated in the enabling statutes and the Final Report. Since this lies within the purview of the Legislature, there is no constitutional infirmity with the mandates issued to the Commissioner. The affected entities had the opportunity to be heard and the powers given to the Commission, such as the ability to determine whether operating licenses would be revoked, is no greater than the power already granted to the Commissioner of Health.
Conclusion
A “facially broad . . . legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits.” (Boreali at 9, citing Tribe, American Constitutional Law § 5-17, at 288-289.) “That a legislative enactment will be presumed constitutional is an elementary but significant principal of law. . . . While this presumption is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt.” (Medical Socy. of State of N.Y. v Sobol, 192 AD2d 78, 81 [3d Dept 1993].) This is a heavy burden and only as a last resort will the courts strike down legislative enactments on the ground of constitutionality. (Martin v State Liq. Auth., 43 Misc 2d 682 [1964].) Since plaintiffs have failed to present authority or a case with the same fact pattern as the case at bar, that is, where the Enabling Legislation indicated the policy, enumerated standards, and appointed a commission within its area of competence to promulgate regulations, in which the courts found an unconstitutional delegation of authority, plaintiffs have failed to meet their burden. As such, plaintiffs have failed to establish beyond a reasonable doubt that the Enabling Legislation is unconstitutional.
Accordingly, the court finds no constitutional infirmity in the Enabling Legislation, in its creation of the Commission or in its delegation to said Commission of the power to examine, analyze and make recommendations concerning the future of New York State’s health care resources and determine which hospitals and nursing homes are to be closed or downsized.
This court is cognizant of the difficulties patients such as Ms. McKinney may face by the closing of their trusted medical facility, but the legal issues raised herein necessitate the denial of *759 the extraordinary relief requested by the plaintiffs and dismissal of plaintiffs’ complaint.
For all of the foregoing reasons, the court denies the plaintiffs’ motion for injunctive relief. Defendants’ cross motion for dismissal of the complaint is granted.

. The record establishes that WSMC has filed a petition in the United States Bankruptcy Court pursuant to chapter 11. In said petition, WSMC indicated that it was affiliated with NYPHS and that NYPHS had already proposed a willingness to continue health care services for those using the WSMC facility. {See defendants’ exhibit B, copy of WSMC bankruptcy petition.) Apparently, WSMC was not joined in this action due to the automatic stay provisions of the Bankruptcy Code.

. The definition of streamline as provided in Webster’s Dictionary is to make shorter, simpler or more efficient.